UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PETER DAZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:  1:17-cv-316-JMS-MPB |
| | ) | |
| | ) | |
| STATE OF INDIANA, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Because Plaintiff Peter Daza's employment with the Indiana Department of

Transportation ("INDOT") was terminated as a result of his insubordinate behavior and not as a

result of unlawful discrimination or retaliation, Defendants State of Indiana, Russell Fowler,

Nina Daniel, and Valeria Cockrum respectfully request the Court to grant summary judgment for

the Defendants and against Plaintiff on all claims. In support of their Motion, Defendants state as

follows.

**I.**     **Introduction**

Plaintiff Peter Daza is an admitted "troublemaker," who derides INDOT's attempts to

foster a culture of "Respect, Teamwork, Accountability, and Excellence" as a "culture of

conformity" to which he "can't comply." It is no surprise then, that after years of insubordinate

or borderline behavior, Deputy Cmm'r Fowler finally terminated Mr. Daza's employment on

December 10, 2015 following a series of incidents involving several different state employees.

Unable or unwilling to accept that it is his own bad behavior that led to the end of his

employment, he claims – without proof – that everyone who has complained about him must

have been motivated by some political, or racial, or age discriminatory bias. The truth is far simpler – Mr. Daza is a gifted geologist, but his behavior was unacceptable.

Mr. Daza claims that the principal reason for the termination of his employment was politics. He believes that he was fired because of a letter to the editor written by his mother shortly before his employment ended, or because he defended a work colleague, or possibly merely because he is a Democrat. Admitting that none of the Defendants have ever expressed any bias against the Democratic Party, Mr. Daza has no evidence beyond his own speculation that powerful Republican Party elites seek to persecute him. For instance, he believes that his mother's letter played a role in his termination only because a friend said that former gubernatorial candidate John Gregg had heard as much. Mr. Daza's politics had nothing to do with his termination – it was only his insubordinate behavior.

Mr. Daza also claims that he was fired because of race. Lacking any actual evidence of a discriminatory motive, Mr. Daza speculates that Sheryl Proctor complained against him because she did not like the way he looked. He admits that Ms. Proctor, however, never did or said anything that would indicate a racial bias, and Mr. Daza claims that the evidence of her bias is "not something you can enunciate." In reality, Ms. Proctor notified her supervisor of Mr. Daza's disengagement from her December 2015 training because, among other things, he said the training "is fucking gay." Mr. Daza's race / color had nothing to do with his termination – it was only his insubordinate behavior.

Finally, Mr. Daza claims that he was fired because of his age. Here he claims that Ms. Proctor's partner Britni Saunders "piled onboard [Ms. Proctor's complaint] and said, look at that old Indian man over there; mad at him because he closed his eyes." Mr. Daza admits that Ms. Saunders never said or did anything age discriminatory, and he has not offered any reason to

believe she acted out of bias. Indeed, he even admits that Ms. Saunders may have been motivated by him "closing his eyes" (i.e., falling asleep) in addition to or instead of age.  Mr. Daza's age had nothing to do with his termination – it was only his insubordinate behavior.

Mr. Daza has brought this lawsuit without finding even a scintilla of evidence that he was the subject of invidious discrimination. Thus, the Court must enter summary judgment against Mr. Daza on all claims, and vindicate the Defendants and other state employees who he has unfairly disparaged for the last two years.

## II.    Statement of Material Facts not in Dispute

### A.  INDOT terminated Mr. Daza as a result of his insubordinate and unacceptable behavior.

INDOT District Deputy Commissioner Russell Fowler terminated Peter Daza's employment with INDOT on December 10, 2015 due to Mr. Daza's "lack of judgment and inability to conduct [himself] in a manner in which [his] actions do not bring [him] or the Agency into disrepute. . . ." (Ex. 3-A.) *See also* (Ex. 102, Fowler Decl. ¶ 5) (affirming that termination letter states the reasons for Mr. Daza's termination). Mr. Fowler cited four specific examples of Mr. Daza's ongoing misconduct in a letter of termination that was given to Mr. Daza on the day his employment was terminated. (Ex. 3-A.) *See also* (Ex. 101, Daza Dep. at 121:12 to17) (affirming receipt of the termination letter). First, Mr. Fowler cited "defiant and insubordinate behavior" for which Mr. Daza received a Written Reprimand on March 12, 2013. (Ex. 3-A); (Ex 3-A-1.) Second, when Director Valerie Cockrum met with Mr. Daza on November 30, 2015 to discuss "his abrasive interaction with another Director [T.J. Brink], and "suggested that [Mr. Daza] meet with [Mr. Brink] to clear the air, [Mr. Daza] declined to do so." (Ex. 3-A.) *See also* (Ex. 101, Daza Dep. at 132:4 to 25) (affirming that this relates to a meeting with Ms. Cockrum, relating Mr. Brink). Third, Mr. Daza "refused to participate fully in an

Agency required training evidenced by [his] leaning back with arms folded and eyes closed and commenting 'this is fucking gay' in reference to one of the training exercises." (Ex. 3-A.) Finally, Mr. Daza "disseminated [ ] an email to possible [spot bonus] awardees concerning an, as of yet, unapproved bonus request." (Ex. 3-A.)

      1.  <u>Mr. Daza was reprimanded on March 12, 2013 for public insubordination.</u>

In 2013, due to heavy construction relating to the development of I-69 corridor through INDOT's Vincennes District, the District was especially busy. (Ex. 102, Fowler Decl. ¶¶ 7, 8.) Accordingly, Deputy Comm'r Fowler informed his subordinates that anyone with an INDOT issued cell phone would be required to be available for phone calls after regular business hours to ensure that construction could continue without delays. (Ex. 102, Fowler Decl. ¶ 9.) This was not an expectation that INDOT employees be available 24/7, but merely an "expectation to have his cell phone on him for urgent matters. . . ." (Ex. 3-A at 2); (Ex. 105, Fowler Dep. at 35:5 to 23.) During the spring construction conference, Mr. Daza publicly refused to comply with Deputy Commissioner Fowler's directive, "in front of the employees [Mr. Daza] supervises, the members of the construction staff, and other directors." (Ex. 3-A at 2.) Because Mr. Daza's behavior "did not exhibit the professional and leadership qualities that are expected of a supervisor in this department and agency," and because "[t]his defiant and insubordinate behavior is not acceptable nor does it reflect the core four principles that all employees of this agency are expected to exhibit, especially supervisors," Brent Schmitt issued Mr. Daza a written reprimand on March 12, 2013. (Ex. 3-A-1.)

      2.  <u>Mr. Daza had abrasive interactions with Director T.J. Brink.</u>

On November 24, 2015, Director T.J. Brink spoke with Director Cockrum about an incident relating to Mr. Daza's use of respirators that did not meet OSHA standards following an OSHA training session. (Ex. 3-B.) "[Director Brink] was not happy with [Mr. Daza's] behavior

or responses to [Director Brink's] questions during the OSHA training. [Director Brink] felt that [Mr. Daza]'s attitude towards him was poor and that [Mr. Daza] was a bad influence on Clint Morgan." (Ex. 3-B.) Director Brink also "expressed his feelings about [Mr. Daza's] behavior in the past stating that [Mr. Daza's] negativity was not in align[ment] with INDOT's new culture." (Ex. 3-B.) In addition, Director Brink believed that Mr. Daza had intentionally checked out unsafe respirators after being told not to do so; Director Cockrum defended Mr. Daza on this issue, and "pointed out the respirators had been checked out prior to the respirator portion of the OSHA training. . . ." (Ex. 3-B). *See also* (Ex. 101, Daza Dep. at 241:2 to 25) (acknowledging that Director Cockrum defended him to Director Brink).

On November 30, 2015, Director Cockrum "met with [Mr. Daza] and Clint to discuss the incident with TJ during the OSHA training. [Director Cockrum] met with [Mr. Daza] first explaining that he had upset TJ and not for the first time. The first incident occurred over Pete's refusal to change an accident from unpreventable to preventable." (Ex. 3-B.) In that instance, one of Mr. Daza's subordinates with a history of accidents "hit a downed tree branch and broke off the side mirror of the state vehicle." (Ex. 51 at 3.) When Director Brink notified Mr. Daza that "this is a preventable accident," Mr. Daza became argumentative, and claimed that Director Brink was just motivated by a desire to fire Mr. Daza's subordinate. (Ex. 51.)

When Director Cockrum met with Mr. Daza, she "warned him that he was making an enemy out of TJ as it stood and [she] offered that talking to TJ might clear the air and would help TJ understand the situation [relating to the respirators]." (Ex. 3-B.) Mr. Daza, however, "stated he wasn't going to talk to TJ." (Ex. 3-B.) By contrast, Clint "stated he would talk to TJ and to apologize to clear up any confusion," and he "made contact with TJ in person the following week." (Ex. 3-B.)

### 3. Mr. Daza refused to participate in and disparaged Agency required training.

On December 3, 2015, shortly after Mr. Daza's conflict with Director Brink during OSHA training, he failed to engage in, and disparaged, another INDOT training session. *See generally* (Ex. 7-L.) After the training session, Sheryl Proctor, a Senior Talent Development Specialist sent observation notes about Mr. Daza's misconduct to her supervisor, Heather Devocelle. (Ex. 7-L.)

Ms. Proctor reported that during introductions, other participants "engaged in conversation, but Pete said nothing other than his name. (Ex. 7-L at 2.) Throughout the training session, "Pete frequently leaned back in his chair with his arms crossed over his chest. He did not take notes or follow along too often in the binder of handouts. Several times he closed his eyes." (Ex. 7-L at 2.) During an exercise for practicing providing written recognition to subordinates, "Pete sat with arms folded and did not participate." (Ex. 7-L.) Then when the participants were instructed to share their recognition with a partner, Mr. Daza told Tim Mercker that "This is f_ _ _ _ ing gay." (Ex. 7-L at 2.) When Ms. Proctor asked Mr. Daza why he did not write his recognition down, he responded only that "[i]t's all in my head. Why do I need to write it down?") (Ex. 7-L at 2.) At the end of the training session, "[Mr. Daza] again had his eyes closed when the facilitator asked participants to pull out the evaluation form to complete. He 'woke up' while everyone was writing, looked around, but did not pull out the form to complete." (Ex. 7-L at 2.)

After receiving this report from Ms. Proctor, Ms. Devocelle forwarded it to Eric Kleinert, SPD's embedded Human Resources Director at INDOT. (Ex. 7-L at 1.) Ms. Devocelle asked Mr. Kleinert "to have this addressed" while she worked "to determine [*sic*] best next steps." (Ex. 7-L at 1.) She further told Mr. Kleinert that she "d[id]n't want Pete coming to Day 2 'as is' so I need

to work quickly." (Ex. 7-L at 1.) Ms. Devocelle then forwarded this request to Ms. Daniel, who forwarded it again to Deputy Cmm'r Fowler. (Ex. 7-L at 1.) Deputy Cmm'r Fowler responded that "[t]his behavior from Pete, as a supervisor, & reinforcement from Bill, as his Supervisor, troubles me greatly. To say my patience is worn thin with Pete is understated." (Ex. 7-L at 1.)

The following Monday, December 7, 2018, Ms. Daniel sent an email to more senior SPD human resources officers, Suzanne Kent and Mr. Kleinert, setting out considerations for terminating Mr. Daza's employment. *See generally* (Ex. 7-F.) Ms. Daniel noted that while "his work ethic and knowledge cannot be denied; his behavior and attitude have been called in to question several times." (Ex. 7-F at 3.) In her own personal experience, "Mr. Daza's inappropriate behavior was brought to my attention as early as 2/18/14, the day after I arrived in the district. (Ex. 7-F at 3.) *See also* Section II.B.2, *infra* at 9 (discussing this incident). Ms. Kent responded with several suggestions to Ms. Daniel, and ultimately recommended that "we give a 3 day or 5 day suspension for his language and unprofessional behavior with documentation in writing that any further behavior of this kind would result in termination." (Ex. 7-F at 2.). *See also* (Ex. 7-H at 1) ("It is up to agency's discretion on the next step of discipline, but we feel a 3 or 5 day suspension prior to termination would be the better next step so that it is in writing and he is notified with written documentation vs. verbal communication only."). Ms. Daniel acknowledged this recommendation, and responded that, "Val [Cockrum] understands the lack of formal corrective action and would support a 5 day suspension. She was also adamant that she no longer wants him to have any supervisory responsibilities." (Ex. 7-H at 1.)

In "great consideration" of Ms. Kent's thoughts, Deputy Cmm'r Fowler also responded on the following day, December 8, 2015, that:

> Mr. Daza is a leader within INDOT. With that authority, comes great
> responsibility – to model the behaviors that we expect of all employees. His

behavior at the training presented by the Talent Management Group last Wednesday was unacceptable; language aside, he sent a clear message that he did not want to be there, & was not going to participate – to the trainers and other attendees. It must be noted that while his performance has been historically good, in fact above meets last FY, this incident rises to critical level from a cultural standpoint. We disciplined Mr. Daza in 2013 for failure to live up to Core4 expectations as a supervisor – for exhibiting defiance and below the line behavior in a meeting, not unlike last week. Mr. Daza was informed at that time that this type of behavior was unacceptable & that future incidents would lead to further action – potentially dismissal. While I understand the recommendation for suspension, it shows a level of acceptance of this behavior – that it is ok to behave in this manner as a supervisor, and quite frankly, it is not.

(Ex. 7-F at 1.) In a separate email with Director Fowler and Ms. Daniel, Deputy Cmm'r Fowler further explained that he "fe[lt] termination is the right action," because "I don't know where we would put him where he wouldn't supervise people," and because he was "not sure his [Mr. Daza's] influence on others will improve." (Ex. 7-G at 1.)

> 4. <u>Mr. Daza informed potential spot bonus recipients of their nominations prior to the award decision.</u>

Also on December 7, 2015, while the Defendants were discussing whether to terminate Mr. Daza's employment because of the incidents with T.J. Brink and the training session, Director Cockrum learned that Mr. Daza had been notifying potential $1000 "spot" bonus recipients of their nomination.  *See* (Ex. 7-E at 1) (forwarding Mr. Daza's email). In Mr. Daza's email to the nominees, he stated that "I always inform the nominees upfront of what I did and provide them with the exact text used to justify the bonus," and acknowledged that "[s]ome would argue that this is ill advised as if the nomination is denied, it fosters hard feelings and resentment. . . ." (Ex. 7-E at 2.) He concluded that email by noting "[o]ne final thing, this is a **nomination** and it may be denied, so do <u>NOT</u> assume it's approved. I will keep you all posted on the status, as I can track its progress." (Ex. 7-E at 6.)

Ms. Daniel shared Mr. Daza's email with Mr. Kleinert, noting that:

Pete did not include his Director, Val Cockrum, in the original email, but it was cc'ed to her when Khalil responded. Since Val worked with Pete on the justification for this bonus I think she felt it was a bit underhanded and passive aggressive for Pete to send out such an email when they had not settled on an appropriate bonus amount. Now how is management going to look if the bonus amount is changed or if the bonus has to be denied?

(Ex. 7-E at 1.)

### B. INDOT struggled with Mr. Daza's conduct for years prior to the termination of his employment.

#### 1. Mr. Daza behavioral problems were noted in his 2013 Evaluation.

Several years before Mr. Daza's employment with INDOT was terminated, the type of behavior issues that resulted in the termination of his employment were referenced in his formal evaluations. Mr. Daza's supervisor, Brent Schmitt noted that "Pete often struggles to work as fiercely or cooperate as well if the assignment is one that he does not agree with or find necessary." (Ex. 6-C at 2.) He further noted that "[m]ost of the time Pete openly supports changes, however on one occasion earlier in the year Pete expressed dissatisfaction with a change that was made in the wrong environment. This event was addressed with a written counseling then a written reprimand and there have been no issues since." (Ex. 6-C at 3.) He wrote that "Pete could work on approving [*sic*] his ability to be objective, forward thinking, and critical of others ideas and opinions while remaining professional and respectful." (Ex. 6-C at 4.) And he wrote that "[o]n at least two occasions this year I had discussions with Pete about remaining professional respectful [*sic*] when dealing with colleagues." (Ex. 6-C at 5.)

#### 2. The Defendants contemplated terminating Mr. Daza's employment in 2014.

Shortly after Ms. Daniel was assigned by SPD to INDOT, she was asked to participate in a meeting with Deputy Cmm'r Fowler, Director Cockrum, Mr. Schmitt, to discuss Mr. Daza behavioral problems. *See generally* (Ex. 7-N.) Those present "[we]re all in agreement that

something has to give." (Ex. 7-N.) Ms. Daniel asked "if Pete was salvageable and got a lukewarm response. Everyone seem[ed] exhausted with the situation." (Ex. 7-N.)

In a March 5, 2014 email addressing that situation, Ms. Daniel wrote that "[h]is job knowledge, according to Brent [Mr. Daza's supervisor], is probably one of the best in the state, but his professionalism and interaction with Brent has become, in Rusty's words, 'a cancer on the department.' Brent feels that Pete tries to usurp his authority especially with departmental employees. (Ex. 7-N.)

Ms. Daniel noted that:

My take is if he is salvageable than we need a CTJ meeting. We need to set specific expectations about his behavior and what that should look like. All three [Fowler, Cockrum and Schmitt] state that this has been addressed with Pete and while his behavior seems to improve for a few weeks it doesn't take long for it to tank again. I than offer that they should just have a frank discussion with Pete and ask if he is happy here. If he says 'Yes' than we set guidelines and expectations for him to continue in his current position. If he says 'No' we ask why. If his reasons are things we can help correct we make a plan, if not, we help him form an exit strategy. All respond that sometimes Pete will simply shutdown and not give any input. We prefer he has input.

(Ex. 7-N at 1.) She then asked Jeff Sullivan, then SPD's embedded Human Resources Director at INDOT, if there were any options for Mr. Daza in INDOT, but outside the Vincennes District, if it was determined that "this position is not the 'right fit' . . . ." (Ex. 7-N at 1.) Finally, she noted that "I have very little on file discipline wise. I have attached what I have which is indicated of a continued pattern of behavior. Unfortunately the largest portion of it was not formally documented." (Ex. 7-N at 1.)

III.  **Legal Arguments**

    A.  **Mr. Daza's political affiliation or activity was not the basis for the termination of his employment.**

        1.  The Defendants did not violate Mr. Daza's First Amendment rights by terminating his employment.

Mr. Daza claims – wrongly, and without any evidence – that "the number[ one" reason for the termination of his employment was "politics." (Ex. 101, Daza Dep. at 18:11 to 13.) Political discrimination and retaliation is actionable as a First Amendment violation under 42 U.S.C § 1983, but those claims must fail because Mr. Daza's political affiliation and/or activity played no role in Deputy Cmm'r Fowler's termination decision. *E.g.*, *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004) (holding that firing government employees based on political motivation violates the First Amendment). Mr. Daza variously claims that he was fired simply for being a Democrat, for defending another Democrat in the workplace, and as a result of a letter to the editor that his mother wrote criticizing former Gov. Pence's policy regarding Syrian immigrants in Indiana. (Ex. 101, Daza Dep. at 107:2 to 8.) In truth, he was fired simply for his "lack of judgment and inability to conduct [him]self in a manner in which [his] actions do not bring [him] of the Agency into disrepute. (Ex. 3-A.)

Much like other types of alleged employment discrimination, Mr. Daza bears the burden of making a *prima facie* showing of employment discrimination. *Hall*, 389 F.3d at 762. He "must show two things: first, that the plaintiff's conduct was constitutionally protected, and second, that the protected conduct was a substantial or motivating factor in the employment decision." *Id*.[1] Only "[i]f a plaintiff can make the prima facie showing, [does] the burden shift[ ] to the

---

[1] Mr. Daza brought separate claims for political discrimination and retaliation under 42 U.S.C. § 1983, (Am. Compl. at 4-5) [Dkt. 20], but there is no apparent distinction between those claims under the law. *See Kasak v. Vill. of Bedford Park*, 563 F. Supp. 2d 864, 877 (N.D. Ill. 2008) (applying Hall's political discrimination elements to the plaintiff's political retaliation claim). Accordingly, Defendants will address both claims jointly in this section.

defendant to demonstrate a legitimate, nonpolitical reason for the employment decision." *Id*. Mr. Daza cannot make a *prima facie* showing of political discrimination or retaliation, and there is no genuine dispute of material fact that his misconduct formed the true basis for the termination of his employment. And Mr. Daza "cannot rely on the speculation or opinions of non-decision makers as proof that Defendants fired him because of his political affiliation." *Nelms v. Modisett*, 153 F.3d 815, 819 (7th Cir. 1998).

> a) *Mr. Daza's status as a Democrat is not enough to support a political retaliation claim.*

Judgment should be entered on Mr. Daza's claim for "retaliation against the constant annoyance that they had because I'm a Democrat," (Ex. 101, Daza Dep. at 107:2 to 8), because "[i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers or the successful applicant. *Hall*, 389 at 762 (7th Cir. 2004) (citing *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir.1998)). Even if such a claim could be sustained, Mr. Daza admitted that he does not know the political affiliations of any of the Defendants. (Ex. 101, Daza Dep. at 36:20 to 22.) Mr. Daza further admitted that he has never heard any of the Defendants express negative opinions about the Democratic Party. (Ex. 101, Daza Dep. at 38:12 to 40:2.) Thus, it is undisputed that none of the Defendants were motivated in any way to terminate Mr. Daza's employment due to his Democratic party affiliation. (Ex. 102, Fowler Decl. ¶ 6); (Ex. 103, Cockrum Decl. ¶ 8); (Ex. 104, Daniel Decl. ¶ 7.)

> b) *Mr. Daza's "defense" of Terry Goff is not constitutionally protected, nor did it motivate the Defendants to terminate Mr. Daza's employment.*

Mr. Daza also claims that he was discriminated and retaliated against due to his defense of Terry Goff, a current INDOT employee, without ever identifying any constitutionally protected activity, or any evidence that his activity motivated Deputy Cmm'r Fowler to terminate his employment. *E.g.*, (Ex. 101, Daza Dep. at 28:14 to 21.) To the extent there is any evidence of

Mr. Daza defending Mr. Goff, the issues involved are entirely job-related, with politics only ever being raised – speculatively – by Mr. Daza. Nor is there any evidence that Mr. Daza's defense of Mr. Goff motivated any of the Defendants to take any kind of adverse action against him.

      i.   Mr. Goff's refusal to provide a doctor's note when refusing to perform job duties in March 2014 did not play a role in the termination of Mr. Daza's employment in December 2015.

The most recent instance cited by Mr. Daza was an instance in which Mr. Daza was upset that his former supervisor Brent Schmitt requested that Mr. Goff provide a doctor's note for refusing to perform snowplow duties. (Ex. 101, Daza Dep. at 102:21 to 103:2.) *See also* (Ex. 7-O) (Mr. Daza's email exchanges over the issue). As an initial matter, Mr. Daza admitted that this issue had been resolved between he and Mr. Schmitt before it was even brought to Director Cockrum's attention; Mr. Goff refused to provide a doctor's note to support his claim that his medical condition prevented him from performing snowplow duties and accepted the consequences. (Ex. 7-O at 3.) Nonetheless, Director Cockrum assured Mr. Daza that Mr. Goff was not receiving discipline as a result of his refusal, despite failing to provide a doctor's note. (Ex. 7-O at 1.) *See also* (Ex. 101, Daza Dep. at 104:11 to 21) (admitting that Mr. Goff was not written up). And when Director Cockrum explained the applicable policy relating to doctor's notes, "that it could exclude an individual from disciplinary action if his/her was serious enough to warrant work restrictions which would include snow plowing," Mr. Daza thanked her for the explanation. (Ex. 7-O at 1.) There is nothing in these exchanges relating to politics at all, and Mr. Daza's dispute was with his supervisor, not any of the Defendants. *See generally* (Ex. 7-O.) Equally important, it is undisputed that this March 2014 incident did not play any role in the decision to terminate Mr. Daza's employment in December 2015 – more than 18 months later. (Ex. 102, Fowler Decl. ¶ 12); (Ex. 103, Cockrum Decl. ¶ 10); (Ex. 104, Daniel Decl. ¶ 9.)

ii. The decision to promote someone other than Mr. Goff in 2011 did not play a role in the termination of Mr. Daza's employment in 2015.

Another issue Mr. Daza mentioned, was an instance in which he complained that Mr. Goff did not receive a promotion for which Mr. Goff applied in 2011. (Ex. 101, Daza Dep. at 101:13 to 18.) *See also* (Ex. 7-Q) (Mr. Daza's complaint about the denial of Mr. Goff's promotion). In an email to Director Cockrum, Mr. Daza speculated that Mr. Goff did not receive the promotion "because of one reason, politics." (Ex. 7-Q at 2.)[2] At no time has Mr. Daza provided any evidence that politics played a role in that promotion decision, and his own speculation, or the speculation of others is not competent evidence. *Nelms*, 153 F.3d at 819. Mr. Daza also included several inflammatory statements to Director Cockrum, such as "I'm like the CIA and have spies everywhere so I was kept informed what was going on behind the scenes," and an admission that he encouraged another employee to "fight fire with fire" to obtain a promotion. (Ex. 7-Q at 1.) Despite this unprofessional attitude, Director Cockrum responded that "I will keep this to myself and won't forward unless you want me to for some reason. I always appreciate your total honesty Pete. And, your support for Terry is commendable." (Ex. 7-Q at 1.) Director Cockrum did not share this complaint with Ms. Daniel or Deputy Cmm'r Fowler, and so it could not have formed the basis for the termination of Mr. Daza's employment. (Ex. 103, Cockrum Decl. ¶¶ 13, 14.) *See also* (Ex. 102, Fowler Decl. ¶¶ 11, 12); (Ex. 104, Daniel Decl. ¶¶ 10, 11.)

---

[2] Mr. Goff also personally complained that "I am sure I am being discriminated against because of my political affiliation," but offered no basis for that conclusion other than his personal belief that "I am certain I was the most qualified of the internal applicants and I am 95% sure I was selected." (Ex. 53 at 4.)

      iii. The decision to rate Mr. Goff as "Exceeds Expectations" in 2011 did not play a role in the termination of Mr. Daza's employment in 2015.

The last issue Mr. Daza identified relating to Mr. Goff, was an instance in 2011 which Mr. Goff's performance rating was reduced from Outstanding to Exceeds Expectations. (Ex. 101, Daza Dep. at 28:14 to 30:7.) *See also* (Ex. 52) (emails discussing Mr. Goff's evaluation). In that instance, Mr. Daza claims that "she [Director Cockrum] called me up and told me personally what was going on with that. And that was political discrimination." (Ex. 101, Daza Dep. at 30:4 to 7.) *But see* (Ex. 103, Cockrum Decl. ¶ 13) (denying Mr. Daza's claim). Even accepting that testimony as true for the purposes of summary judgment, the contemporaneous emails show that Deputy Cmm'r Fowler responded to the inquiry about Mr. Goff's rating by defending Mr. Goff's performance as "one of the two 'go to' people for the section, who performs his duties very well and is instrumental in the section's overall performance." (Ex. 52 at 2.) While former Chief of Staff Troy Woodruff still disagreed with the rating, he "le[ft] it to you guys [the Vincennes District] to decide what his level should be. . . ." (Ex. 52 at 2.)

There is no evidence that that Mr. Daza's "impassioned argument that you cannot rate this guy [Mr. Goff] a Meets or below," had any impact whatsoever on Mr. Daza's employment. (Ex. 101, Daza Dep. at 29:15 to 19.) Ultimately, Mr. Goff still received an Exceeds Expectations rating, so Deputy Cmm'r Fowler either already agreed with Mr. Daza, or was persuaded by his "impassioned argument." (Ex. 101, Daza Dep. at 30:8 to 9.) And Deputy Comm'r Fowler rated Mr. Goff highly, despite former Chief of Staff Woodruff's opinion that he "would question if it [Mr. Goff's rating] should be exceeds either." (Ex. 52 at 2.) It remains undisputed that this incident did not play any role in the decision to terminate Mr. Daza's employment nearly four years later. (Ex. 102, Fowler Decl. ¶ 15); (Ex.103, Cockrum Decl. ¶ 14); (Ex. 104, Daniel Decl. ¶ 12.)

c) *Mr. Daza's employment was not terminated as a result of his mother's letter to the editor.*

Finally, the Court should enter judgment on Mr. Daza's claim that "[i]t [the termination decision] was retaliation against my mother's letter to the editor," (Ex. 101, Daza Dep. at 107:2 to 8), because it is undisputed that Deputy Commissioner Fowler did not know of the letter at the time of the termination decision, and because Mr. Daza relies entirely on speculation and inadmissible hearsay to support his claim. There is simply no reason to believe that a letter to the editor written by Mr. Daza's mother played any role in the decision to terminate his employment.

Here, as with all First Amendment political discrimination claims, "the threshold question is whether the defendants even knew about the political activities of [Mr. Daza's mother]." *Hall*, 389 F.3d at 762. *See also Nelms*, 153 F.3d at 819 (7th Cir. 1998) ("Nelms first must prove that defendants in fact knew of his Republican party membership."); *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir.1992) ("In order to prove that Barnes was motivated by his political associations, Garrett must first prove that Barnes in fact knew of them.'). And there is no question that Deputy Cmm'r Fowler did *not* know of the letter to the editor. (Ex. 102, Fowler Decl. ¶ 16.) Mr. Daza claims that he informed Director Cockrum of the letter prior to the termination of his employment, but admits that they did not discuss the issues raised by the letter "in any detail," and that "she [Director Cockrum] didn't react in any way that would concern me." (Ex. 101, Daza Dep. at 110:20 to 111:14.) Because Deputy Cmm'r Fowler was the appointing authority who made the termination decision, his lack of knowledge of the letter is fatal to Mr. Daza's claim. (Ex. 102, Fowler Decl. ¶¶ 3, 4, 16.)

Even if Deputy Cmm'r Fowler knew of the letter, there is no evidence that the letter was "a substantial or motivating factor in the employment decision." *Hall*, 389 F.3d at 762. Mr. Daza's basis for believing the letter affected his employment was that "somebody brought it up

that it was rumored that my firing was in part based on – because of letter that my mother wrote

to the paper." (Ex. 101, Daza Dep. at 111:15 to 23.) Specifically, Mr. Daza claims that Terry

Goff told him that John Gregg, the former Indiana gubernatorial candidate:

> He said something to the effect of, [t]here was a geologist that was escorted out
> and fired from INDOT, and it's our understanding that it was over - - a large part,
> due to the letter that his mother wrote to an editor.

(Ex. 101, Daza Dep. at 111:24 to 112:16.) Mr. Daza admits, however, that Mr. Gregg does not

have any involvement in INDOT, and has no connections to the Indiana state government. (Ex.

101, Daza Dep. at 112:24 to 113:4.) The best Mr. Daza can offer as a basis for Mr. Gregg's

alleged knowledge is that "I guess my termination was kind of a big deal in that local thing, so

I'm sure he must have heard about it." (Ex. 101, Daza Dep. at 113:5 to 13.)

This highly prejudicial and self-serving testimony is not competent evidence, of course,

because it is "not merely hearsay but is hearsay heaped upon hearsay." *Am. Co-op. Serum Ass'n

v. Anchor Serum Co.*, 153 F.2d 907, 916 (7th Cir. 1946) (holding that the District Court erred by

allowing self-serving multiple hearsay testimony). *See also United States v. Vasquez*, 635 F.3d

889, 901 (7th Cir. 2011) ("The erroneous admission of this highly prejudicial hearsay and triple

hearsay for the truth of the matters asserted should require a new trial.")." [S]uch double and

triple hearsay is clearly inadmissible evidence and cannot be considered in deciding whether to

grant summary judgment." *Cooper v. Monroe Cty Sheriff's Dep't*, 2013 WL 4510030 at *4 (S.D.

Ill., Aug. 2013) (citing *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002). This is because

"Federal Rule of Civil Procedure 56(e) requires that affidavits supporting a motion in opposition

to summary judgment must set forth facts that would be admissible in evidence." *Boyce v.

Moore*, 314 F.3d 884, 889 (7th Cir. 2002)

Other than this triple hearsay, Mr. Daza's only evidence that his mother's letter motivated

Deputy Comm'r Fowler to terminate his employment is "timing, which is critical." (Ex. 101,

Daza Dep. at 113:22 to 25.) But "a plaintiff alleging retaliation cannot demonstrate causation by suspicious timing alone." *Kasak v. Vill. of Bedford Park*, 563 F. Supp. 2d 864, 877 (N.D. Ill. 2008). Moreover, the three events that actually triggered the termination of Mr. Daza's employment also arose one after another, within a week of each other, with the last occurring only three days before he was fired. (Ex. 3-A) (discussing the incidents on 11/30, 12/2, and 12/7). And there were already concerns about Mr. Daza's future with INDOT at least as early 2014. *See generally* (Ex. 7-N).

Thus the Court should grant summary judgment on Mr. Daza's claims for political discrimination and retaliation (Counts I and II).

### B. None of Mr. Daza's race, color, or age formed a basis for the termination of his employment.

In addition to his claims of political discrimination and retaliation, Mr. Daza also claims that his termination was also motivated by his race, color, and or age.[3] (Am. Compl. ¶¶ 22-23) [Dkt. 20]. Specifically, Mr. Daza testified that he was subject to race / color discrimination because Sheryl Proctor was motivated by his ethnicity to complain about his misconduct during the December 2015 training session, (Ex. 101, Daza Dep. at 50:15 to 51:13), and was told in his termination letter that "[w]e fired you for your culture." (Ex. 101, Daza Dep. at 73:10 to 15.) Likewise, Mr. Daza's age discrimination claim is based on his belief that Britni Saunders "piled onboard [Ms. Proctor's complaint] and said, look at that old Indian man over there; mad at him because he closed his eyes." (Ex. 101, Daza Dep. at 80:22 to 81:6.) He also claims he was discriminated against because INDOT filled Mr. Daza's former position two years later with "some young kid." (Ex. 101, Daza Dep. at 81:7 to 12.)

---

[3] Mr. Daza's Amended Complaint also includes a claim for disability discrimination, but he has voluntarily withdrawn that claim. (Pl.'s Statement of Claims) [Dkt. 39].

Mr. Daza does not, however, have any evidence of discrimination beyond his own subjective belief that some factor other than his own long history of bad behavior must be the reason his employment was terminated. *E.g.*, *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and '[d]iscrimination law would be unmanageable if disgruntled employees ... could defeat summary judgment by affidavits speculating about the defendant's motives.'") (quoted in *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)). He cannot articulate the basis for his beliefs that either Ms. Proctor or Ms. Sanders were motivated by age or race. (Ex. 101, Daza Dep. at 52:6 to 7) ("That's not something you can enunciate."). The only culture ever referenced by the Defendants was "an expectation for all INDOT employees to support a culture of Respect, Teamwork, Accountability, and Excellence." (Ex. 3-A.) And the younger employee hired by INDOT was only chosen two years after the termination of Mr. Daza's employment, after INDOT tried and failed to hire an employee who was older than Mr. Daza. (Ex. 101, Daza Dep. at 84:22 to 85:16.)

Mr. Daza is not able to establish his prima case of discrimination in this case, which requires him to "set[ ] forth evidence that: '(1) [ ]he is a member of a protected class, (2) h[is] job performance met [the employer's] legitimate expectations, (3) [ ]he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). *See also Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("In general, the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983. . . .") (overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760

(7th Cir. 2016)). His claims must further fail because Mr. Daza's employment was terminated due to his conduct and not his race, color, or age – a "legitimate, nondiscriminatory reason." *McKinney*, 866 F.3d at 807 (quoting *McDonnell Douglas*, 411 U.S. 792, 802 (1973)). And though Mr. Daza has claimed that INDOT's stated reason for terminating is a pretext for discrimination, he cannot carry his burden of "present[ing] evidence" on that point. *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)).

Thus, the Court should enter judgment on each of these meritless theories of discrimination (Count I).

1.  Mr. Daza's race or color played no role in the decision to terminate his employment.

Mr. Daza claims that he was discriminated on the basis of race or color because "she [Sheryl Proctor] didn't like me because she didn't like the way I looked, which means she didn't like me because of my ethnicity." (Ex. 101, Daza Dep. at 51:11 to 13.) He also claims that he was discriminated against because he could not fit into INDOT's "culture of conformity." *E.g.*, (Ex. 101, Daza Dep. at 75:5 to 8.) As for Ms. Proctor, there is no evidence beyond Mr. Daza's speculation that she was in any way motivated by racial animus, (Ex. 101, Daza Dep. at 69:3 to 19); but even if she was, she was not in any way involved in the decision to terminate his employment. (Ex. 102, Fowler Decl. ¶ 21); (Ex. 103, Cockrum Decl. ¶ 19); (Ex. 104, Daniel Decl. ¶ 17.) With respect to INDOT's "Culture," embodied by its race-neutral Core4 values of "Respect, Teamwork, Accountability, and Excellence," Mr. Daza was indeed unable to conform to the agency's  race-neutral expectations, and that failure is the reason he is no longer employed by INDOT. (Ex. 3-A); (Ex. 102, Fowler Dep. ¶ 4.)

a)  *Ms. Proctor's observational notes about Mr. Daza's disengagement is not racial discrimination.*

Mr. Daza has unfairly and wrongly painted Ms. Proctor as racially motivated in her complaints against him, simply because he cannot accept her criticism that he was disengaged from her December 2015 training session. When asked why he believed this, Mr. Daza admitted that "[t]hat's not something you can enunciate." (Ex. 101, Daza Dep. at 52:6 to 7.) Indeed, it is undisputed that neither Ms. Proctor nor Ms. Saunders ever made any kind of disparaging or off-color statements relating to Mr. Daza's race or ethnicity. (Ex. 101, Daza Dep. at 56:5 to 7, 57:5 to 9, 68:16 to 17.) In their absence, Mr. Daza asks the Court to endorse his purely speculative theory that "the logical conclusion is, is why would she have a problem with you if she doesn't know you from Adam. Well, it's because of how you look." (Ex. 101, Daza Dep. at 69:14 to 19.) He asks the Court to reach this inference, despite admitting that Ms. Proctor may well have been motivated in her complaint by Mr. Daza's apparent disengagement from the training. (Ex. 101, Daza Dep. at 71:11 to 14.) The Court cannot accept such speculation as the basis for finding racial animus. *E.g.*, *Rand v. CF Indus., Inc.*, 42 F.3d at 1146.

Even if Ms. Proctor were secretly motivated by racial animus, however, that animus did not play a role in the termination decision because she was not involved in Deputy Comm'r Fowler's decision-making process. (Ex. 102, Fowler Decl. ¶ 21); (Ex. 102, Cockrum Decl. ¶ 19); (Ex. 102, Daniel Decl. ¶ 17.) *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("[B]igotry, *per se,* is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action.") (quoting Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir.2001). Mr. Daza admits that none of the Defendants were personally motivated by race, and instead appears to assert a "cat's paw" theory – that they were guilty of discrimination by proxy. (Ex. 101, Daza Dep. at

57:21 to 58:19.) *See*, *e.g.*, *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) ("Our cases have long recognized that a final decision-maker's reliance on an improperly motivated recommendation from a subordinate may render the corporate employer liable because the subordinate acts as the firm's agent.") The "cat's paw" theory of liability does not apply here, however, because the Defendants made their decision based on an independent analysis of Mr. Daza's behavior, because Ms. Proctor is not Mr. Daza's supervisor (or even an INDOT employee), and because there is no evidence that Ms. Proctor intended to cause an adverse employment action.

Liability can only be imputed to the Defendants "if a supervisor performs an act motivated by [a discriminatory or retaliatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable...." *Hicks v. Forest Pres. Dist. of Cook Cty., Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (quoting *Staub v. Proctor Hosp.,* 562 U.S. 511 (2011)). Mr. Daza cannot meet the threshold requirement of the "cat's paw" theory because Ms. Proctor was not Mr. Daza's supervisor. (Ex. 102, Fowler Dep. ¶ 18). *E.g.*, *Smith*, 681 F.3d at 897 (permitting imputed liability because the discriminatory actor is "the firm's agent")

There is also no reason to believe that Ms. Proctor intended to cause an adverse employment action because she did not communicate any of her complaints to any of the Defendants – she instead simply provided observational notes without any request for action to Heather Devocelle, her supervisor, which passed through a circuitous route before finally reaching Deputy Comm'r Fowler, the decision-maker. (Ex. 7-L at 1).[4] *See*, *e.g.*, *Smith*, F.3d at

---

[4] Ms. Devocelle forwarded the notes to Eric Kleinert, her supervisor, with a request only that Mr. Daza not be permitted to return to the second day of training. (Ex. 7-L at 1.) Ms. Devocelle then forwarded her request to Ms. Daniel, the SPD's embedded human resources representative at INDOT, who in turn forwarded them to Mr. Fowler. (Ex. 7-L at 1.)

897 (requiring an "improperly motivated *recommendation*") (emphasis added); *Hicks*, 677 F.3d at 790 (requiring an intent to "to cause an adverse employment action"). Moreover, the Defendants engaged in an internal discussion about Mr. Daza's history of poor behavior, as well as discussions with SPD advisors, that did not involve any input from Ms. Proctor. (Ex. 7-D); (Ex. 7-E); (Ex. 7-F); (Ex. 7-G); (Ex. 7-H); (Ex. 7-L); (Ex. 102, Fowler Decl. ¶ 22); (Ex. 103, Cockrum Decl. ¶ 20); (Ex. 104, Daniel Decl. ¶ 18.)

       b)  *INDOT's expectation that Mr. Daza act with "Respect, Teamwork, Accountability, and Excellence" is not racial discrimination.*

Mr. Daza also claims that it was racial discrimination for INDOT to cite his failure to live up to its racially neutral culture of "Respect, Teamwork, Accountability, and Excellence" in terminating his employment. (Ex. 101, Daza Dep. at 73:10 to 15.) Mr. Daza, however, is unable to identify how INDOT's values are racially discriminatory, beyond claiming that "I can't comply to that culture. I don't fit in with what they consider the norm because I don't look like them and I don't have the politics, so I can't comply." (Ex. 101, Daza Dep. at 73:16 to 23.) Far from being evidence of discrimination, Mr. Daza's derision of INDOT's "culture of conformity" is evidence that he was not meeting INDOT's legitimate expectations. *See*, *e.g.*, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (affirming that Plaintiff's "abrasiveness and insubordination" did not meet employer's legitimate expectations).

There is simply nothing discriminatory about the requirement that "all INDOT employees" live up to a culture of "Respect, Teamwork, Accountability, and Excellence." (Ex. 3-A.) Mr. Daza admits that the reference to "culture" in his termination letter does not reference his race or color in any way. (Ex. 101, Daza Dep. at 74:13 to 16.) He admits that Deputy Comm'r Fowler never expressed any sentiment that Mr. Daza's ethnic or racial culture were a problem at INDOT. (Ex. 101, Daza Dep. at 76:15 to 18.) And he admits that other non-white INDOT

employees have been successful at INDOT. (Ex. 101, Daza Dep. at 75:16 to 20.) When asked if he could identify anything in INDOT's Core4 values that have anything to do with race or ethnicity, he only responded that it "could be," and that "a lot of things are Anglocentric." (Ex. 101, Daza Dep. at 78:15 to 20.) He could not, however, identify *anything* about INDOT's values that were racially discriminatory. (Ex. 101, Daza Dep. at 79:13 to 17, 80:5 to 8) ("I can't answer that now.")

To the contrary, it is a legitimate business expectation that INDOT's employees act with "Respect, Teamwork, Accountability, and Excellence." *See*, *e.g.*, *Ferrill v. Oak Creek-Franklin Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) (Plaintiff failed to establish *prima facie* case in part because "her management style was confrontational and inconsistent" and she was "prone to hostility toward opposing viewpoints."). Mr. Daza has admitted that he simply cannot live up to those legitimate expectations, testifying that: "I can't conform. And it's not because I don't want to, it because I can't. I just can't. I'm not like them. I'm just not like them, and I never will be." (Ex. 101, Daza Dep. at 75:9 to 12.) *See also* (Ex. 101, Daza Dep. at 37:20) ("So I'm kind of like a troublemaker.").

Thus, the Court should enter summary judgment on all of Mr. Daza's claims for race or color discrimination (Count I).

> 2.   Mr. Daza's age played no role in the decision to terminate his employment.

There is likewise no substance to Mr. Daza's claims that was discriminated on the basis of age. (2nd Am. Compl. ¶¶ 22-23) [Dkt. 20]. Mr. Daza first speculates that "Britni Saunders is quite a bit younger than me. She piled onboard and said, Look at that old Indian over there; mad at him because he closed his eyes." (Ex. 101, Daza Dep. at 80:22 to 81:2.) He also claimed that it was discriminatory for INDOT to fill his position two years after he was fired, with a younger employee. (Ex 101, Daza Dep. at 81:8 to 12.) As for Ms. Saunders, Mr. Daza could not identify

any basis beyond his own speculation that she was motivated by his age, and her only involvement was to notify one of her superiors about an encounter with Mr. Daza's supervisor during the second day of the December 2015 training. (Ex. 7-D at 3.) As for the hire of Logan Mort-Jones, INDOT only just filled Mr. Daza's vacant position in December, two years after Mr. Daza's employment was terminated, and after attempting to hire an older replacements.

   a) *Ms. Saunder's email to Ms. Devocelle about the conversation with Mr. Tompkins about Mr. Daza's disengagement is not racial discrimination.*

As with Ms. Proctor, Mr. Daza's allegations that Ms. Saunders was motivated by discriminatory animus toward him are false and patently unfair. Ms. Saunders never contacted any of the Defendants about Mr. Daza. (Ex. 102, Fowler Decl. ¶ 23); (Ex. 103, Cockrum Decl. ¶ 21); (Ex. 104, Daniel Decl. ¶ 19.) Rather, she only notified Ms. Devocelle about the details of a conversation that she and Ms. Proctor had with Bill Tompkins when he asked why Mr. Daza was disinvited from the second day of the December 2015 training. (Ex. 7-D at 3-4.) Mr. Daza claims that Ms. Saunders "piled onboard," but that, like his claim that "she was obviously objecting to an old guy that has tired eyes," is pure speculation outside his personal knowledge. *E.g.*, *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994). He admits that Ms. Saunders never said anything indicating she disliked Mr. Daza because of his age. (Ex. 101, Daza Dep. at 87:12 to 14.) And he admits that he has no reason to believe that Ms. Saunders was motivated by age rather than by his behavior. *See* (Ex. 101, Daza Dep. at 88:1 to 9) ("other than the fact that she piled on and complained about me, no.").

Indeed, Mr. Daza's testimony that he believes Ms. Saunders probably objected to both his age *and* his eyes being closed defeats his claim. (Ex. 101, Daza Dep. at 89:10 to 18.) This is because Mr. Daza can only avoid summary judgment on his age discrimination claim if he "produce[s] evidence from which a jury could infer that [his] age 'was a but-for cause of his

- 25 -

termination.'" Ripberger v. Corizon, Inc., 773 F.3d 871, 880 (7th Cir. 2014) (citing Fleishman v. Cont'l Cas. Co., 698 F.3d 598, 604 (7th Cir. 2012). Unlike the broader Title VII discrimination claim, which permits mixed motive liability, Mr. Daza's claim of mixed motives in this case is fatal to his claim. *E.g.*, *Carson v. Lake Cty*, 865 F.3d 526, 532 (7th Cir. 2017)

Mr. Daza's age discrimination claim also fails for the same reason as the his race discrimination claims must – there is no evidence that Ms. Saunders alleged animus played a role at all in Deputy Comm'r Fowler's termination decision. *See Adams*, 324 F.3d at 939. "[B]igotry, *per se,* is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." Like Ms. Proctor, Ms. Saunders was not involved in the Defendants deliberations about Mr. Daza. (Ex. 102, Fowler Decl. ¶ 22); (Ex. 103, Cockrum Decl. ¶ 20); (Ex. 104, Daniel Decl. ¶ 18.) And there can be no "cat's paw" liability because Ms. Saunders was not his supervisor, and she made no recommendations that the Defendants take any adverse action against him. *E.g.*, *Smith*, 681 F.3d at 897 (permitting imputed liability because the discriminatory actor is "the firm's agent" and requiring an "improperly motivated *recommendation*"); *Hicks*, 677 F.3d at 790 (requiring an intent to "to cause an adverse employment action").

      b)  *INDOT's hiring of Logan Mort-Jones two years after Mr. Daza's employment was terminated is not age discrimination.*

Moreover, INDOT's hiring of Logan Mort-Jones in December 2017 does not establish the required *prima facie* case of age discrimination. *See, e.g.*, *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003) (requiring proof that INDOT "hired another similarly situated individual for the position who was substantially younger"). First, INDOT attempted to hire Robert Dyer to fill Mr. Daza's former position – a 61 year-old who was more than 10 years older than Mr. Daza. (Ex. 101, Daza Dep. at 84:22 to 85:16.) Second, it was only

after Mr. Dyer declined the offer, and two full years after Mr. Daza's employment ended, that INDOT finally hired Mr. Mort-Jones as a Geologist. (Ex. 101, Daza Dep. at 85:21 to 24.)

Given the two year delay between the termination of Mr. Daza's employment, and the hiring of Mr. Mort-Jones, no reasonable person could conclude that Mr. Daza has made a *prima facie* case that INDOT "hired another similarly situated individual for the position who was substantially younger." *Zaccagnini.*, 338 F.3d at 675. Several Circuit Courts have recognized that where there is a significant delay in replacing a protected worker with a younger one, establishing a *prima facie* case requires additional evidence. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1422 (9th Cir. 1990) (many of the duties were assumed by a younger worker but some six or seven months later) (citing *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 941 (6th Cir. 1987) (younger replacement arrived three months later)). There is no additional evidence in this case from which one could infer an age discriminatory motive.

Indeed, the only relevant additional evidence of motive is the admitted fact that INDOT attempted to hire an older employee to fill Mr. Daza's former position. (Ex. 101, Daza Dep. at 84:22 to 85:8.) And this was no idle attempt to hire Mr. Dyer; Deputy Comm'r Fowler made a formal offer of employment to Mr. Dyer, which was rejected by Mr. Dyer. (Ex. 101, Daza Dep. at 85:9 to 13.) It is only because Mr. Dyer rejected this offer that the position was available to be filled by the younger Mr. Mort-Jones. Under these circumstances, it cannot reasonably said that Mr. Daza's employment was terminated because of his age.

Thus, the Court should grant summary judgment on Mr. Daza's claim for age discrimination (Count I).

3. Mr. Daza's retaliation claims under Title VII, ADEA, and Section 1981 are
barred.

a) *Mr. Daza's retaliation claims under Title VII and ADEA are barred because
he failed to include the issue in his Charge of Discrimination.*

Because Mr. Daza never raised his Title VII and ADEA retaliation claims in his *Charge
of Discrimination*, the Court should enter summary judgment on those claims. *E.g.*, *Lavalais v.
Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) ("Generally, 'a Title VII plaintiff cannot
bring claims in a lawsuit that were not included in her EEOC charge.'") (quoting *Cheek v. W. &
S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1101–
02 (7th Cir. 2013) (applying the same rule to ADEA claims). Although Mr. Daza alleged that he
was "being discriminated against due to my race, Hispanic and Native American, color darker
skin, age, over 40, and disability," he failed to make any allegations of retaliation, and did not
check the "RETALIATION" box. (Ex. 5-B.)[5]  These basic allegations of discrimination are not
sufficient to permit a retaliation claim, because "[n]ormally, retaliation and discrimination
charges are not considered 'like or reasonably related' to one another. Sw*earingen-El v. Cook
Cty. Sheriff's Dep't*, 602 F.3d 852, 864–65 (7th Cir. 2010). "Where there 'is no mention of
retaliation or any other words to that effect' in an EEOC charge, a district court may properly
enter summary judgment on the defendant's behalf on a retaliation claim in the complaint.
*Cooksey v. Bd. of Educ. of City of Chicago*, 17 F. Supp. 3d 772, 789 (N.D. Ill. 2014) (quoting
*Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544–45 (7th Cir.1988).

---

[5] Mr. Daza's *Civil Service Employee Complaint* likewise makes no mention of retaliation. (Ex. 4-A.)

   b) *Mr. Daza's allegations of political retaliation are not protected by Title VII, the ADEA, or Section 1981.*

Not only did Mr. Daza fail to raise retaliation at the EEOC, but he has only testified the termination of his employment was "retaliation against my mother's letter to the editor, retaliation against the constant annoyance that they had because I'm a Democrat, and I'm defending Terry [Goff]." (Ex. 101, Daza Dep. at 107:2 to 8.) Political affiliation or activity is not, however, protected by the Title VII, the ADEA, or Section 1981. *See* 42 U.S.C. 2000e-2 (prohibiting discrimination on the basis of "race, color, religion, sex, or national origin"); 42 U.S.C. § 2000e-3 (prohibiting retaliation for opposing employment practices made unlawful by Title VII); 29 U.S.C. § 623 (prohibiting age discrimination and retaliation for opposing age discrimination); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (noting that Section 1981 prohibits race discrimination and retaliation "in the making and enforcing of contracts").

  Thus, because Mr. Daza does not claim any retaliation in violation of Title VII, the ADEA, or Section 1981, the Court should enter summary judgment on those claims (Count II).

## IV.    <u>Conclusion</u>

WHEREFORE, for the foregoing reasons, Defendants State of Indiana, Russell Fowler, Valerie Cockrum, and Nina Daniel respectfully request the Court to enter summary judgment against Plaintiff Peter Daza's claims for discrimination and retaliation, and dismiss his Complaint in its entirety. Defendants further request all other just and proper relief.

Respectfully submitted,

CURTIS T. HILL, JR.
Indiana Attorney General
Attorney No. 13999-20

Date:  <u>March 7, 2018</u>           By:    <u>*s/Benjamin C. Ellis*</u>
Benjamin C. Ellis
Deputy Attorney General
Attorney No. 28544-49

OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Phone:  (317) 232-7144
Fax:     (317) 232-7979
Email:  Benjamin.Ellis@atg.in.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 7, 2018, a true and correct copy of the foregoing was filed using the Court's CM/ECF electronic filing system.  Filings can be accessed via the electronic system.  Copies of the filed documents will be electronically sent to all counsel of record in the CM/ECF system.

s/ *Benjamin C. Ellis*
Benjamin C. Ellis
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Phone:  (317) 232-7144
Fax:      (317) 232-7979
Email:  Benjmain.Ellis@atg.in.gov