UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PETER DAZA, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 1:17-cv-00316-JMS-MPB |
| | ) | |
| STATE OF INDIANA, RUSSELL FOWLER, NINA | ) | |
| DANIEL, and VALERIE COCKRUM, | ) | |
| *Defendants.* | ) | |

## ORDER

Plaintiff Peter Daza, who is Hispanic, Native American, and over the age of forty, worked as a geologist for the State of Indiana Department of Transportation ("INDOT") from 1993 until his termination in 2015. Mr. Daza initiated this lawsuit in 2017, alleging that he was discriminated against based on his race, color, age, and "political speech and association," and that his termination was in retaliation for complaining about discrimination and exercising his right to free speech and political association. Defendants the State of Indiana, INDOT District Deputy Commissioner Russell Fowler, INDOT District Human Resources Manager Nina Daniel, and INDOT Technical Services Director Valerie Cockrum,[1] have moved for summary judgment, [Filing No. 46], and that motion is now ripe for the Court's consideration. Also ripe for the Court's consideration is Defendants' Motion to Strike Surreply Arguments. [Filing No. 82.]

## I.
### MOTION TO STRIKE MR. DAZA'S SURREPLY

Before analyzing the substantive arguments Defendants raise in their Motion for Summary Judgment, the Court will consider Defendants' Motion to Strike Surreply Arguments. [Filing No.

---

[1] The individual Defendants are sued in both their official and individual capacities.

<u>82</u>.] This is necessary because the motion relates to the scope of information that the Court could consider in deciding the Motion for Summary Judgment.

Mr. Daza filed a twenty-one page Surreply in Opposition to Defendants' Motion for Summary Judgment on June 8, 2018. [<u>Filing No. 81</u>.] Defendants move to strike portions of the surreply, arguing that those portions do not address Defendants' evidentiary objections but "merely seek[ ] to respond to the Defendants' arguments…." [<u>Filing No. 82 at 2</u>.] They assert that the portions they seek to strike "rehash[ ] arguments [Mr. Daza] has already made, or attempt[ ] to further argue with points raised in the Defendants' reply brief." [<u>Filing No. 82 at 2</u>.]

In response, Mr. Daza argues that the entire surreply addresses Defendants' objections to the evidence he submitted in response to the Motion for Summary Judgment, and so is appropriate. [<u>Filing No. 84 at 3-4</u>.] Mr. Daza also contends that Defendants' reply brief "contains new arguments, and [he] has a right to file a Surreply to new arguments." [<u>Filing No. 84 at 1</u>.]

Local Rule 56-1(d) permits the filing of a surreply "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." Defendants seek to strike pages 9 through 20 of Mr. Daza's Surreply, and the Court finds that some of the arguments contained in that section relate to Defendants' admissibility objections while others do not. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Strike Surreply Arguments to the extent that it will only consider arguments in Mr. Daza's Surreply that relate to the admissibility of evidence.

## II.
### MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and

draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Cv. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### B. Evidentiary Issues

Before setting forth the facts relevant to the Motion for Summary Judgment and analyzing the parties' substantive arguments, the Court will consider the eight groups of evidence to which Defendants object.

First, Defendants object to the "Summary of Events" and the "Summary of Actions of Other Employees Showing Lack of Judgment and Bringing the Agency Into Disrepute" that Mr. Daza submitted in connection with his response brief. [Filing No. 72-1; Filing No. 72-2.] They argue that the documents are not admissible evidence, lack any authentication, are based on hearsay, and are "improper attempts to bypass the 35-page limit on response briefs." [Filing No. 78 at 2.] Mr. Daza argues that these documents are proper under Fed. R. Evid. 1006, which allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." [Filing No. 81 at 2 (quoting Fed. R. Evid. 1006).] The Court will not consider the summaries provided at Filing No. 72-1 and 72-2, as the information contained in the summaries is also contained in other exhibits provided

by Mr. Daza. The summaries are not of the type discussed in Rule 1006, but rather summarize other evidence submitted by Mr. Daza in a way that is favorable to Mr. Daza. The Court will consider the other evidence submitted by Mr. Daza (and referenced in the summaries) as appropriate, but will not consider the summaries themselves.

Second, Defendants object to portions of Mr. Daza's Affidavit, [Filing No. 72-3], as hearsay, outside Mr. Daza's personal knowledge, contradictory to Mr. Daza's emails or deposition testimony, and exceeding the scope of lay testimony. The objection is well-taken, and the Court will only consider portions of Mr. Daza's Affidavit that it finds are not hearsay, that include statements within Mr. Daza's personal knowledge, that do not contradict Mr. Daza's emails or deposition testimony, and that do not exceed the scope of lay testimony.

Third, Defendants object to messages from nonparties, because they are hearsay and lack authentication. [Filing No. 78 at 3-4 (objecting to Filing No. 72-5; Filing No. 72-6; Filing No. 72-7; Filing No. 72-8; Filing No. 72-9; and Filing No. 72-10).] To the extent the messages discuss the basis for Mr. Daza's termination and his contributions to INDOT, Defendants object for lack of personal knowledge. Mr. Daza responds that the messages are authenticated by Mr. Daza's testimony that he personally received the messages, and that they are offered to corroborate his testimony that he was well-liked by other employees. [Filing No. 81 at 6.] The Court finds that there are authentication issues with the messages. For example, Filing Nos. 72-5, 72-6, and 72-7 appear to be screenshots of text messages, but Mr. Daza did not submit an affidavit authenticating the messages, nor did he specify for the Court where in his deposition testimony he testified regarding the specific messages. In any event, the Court discusses the messages to which Defendants object below, and concludes that they are not relevant to the issue of whether Defendants discriminated against Mr. Daza or retaliated against him.

Fourth, Defendants object to several newspaper articles Mr. Daza submits, [Filing No. 72-16; Filing No. 72-25; Filing No. 72-34; and Filing No. 72-35], because "newspaper articles offered for the truth of what they report are inadmissible hearsay." [Filing No. 78 at 4 (citation and quotation omitted).] Mr. Daza responds that the articles are not offered for their truth, but rather "as evidence of the disrepute that other employees brought to the agency." [Filing No. 81 at 6.] As with the messages discussed above, the Court discusses below why the newspaper articles – even if they are considered – do not help to save Mr. Daza's claims from summary judgment.

Fifth, Defendants object to certain documents, [Filing No. 72-23; Filing No. 72-32; Filing No. 72-68], that they argue Mr. Daza has used in violation of a protective order entered in Mr. Daza's appeal of his termination before the State Employees' Appeals Commission ("SEAC"). [Filing No. 78 at 4 (referencing Filing No. 78-1).] The protective order limits the use of personnel documents and information relating to certain individuals to use in Mr. Daza's appeal before the SEAC. [Filing No. 78-1 at 3.] Mr. Daza responds that this case "is a continuation of" the SEAC proceeding. [Filing No. 81 at 7.] The Court has already found that Mr. Daza's use of the documents does not violate the protective order, [Filing No. 85], so considers the documents in connection with Defendants' Motion for Summary Judgment.

Sixth, Defendants object to the Facebook feed of a nonparty, Logan Mort-Jones, because it has not been authenticated, is inadmissible hearsay, and is irrelevant. [Filing No. 78 at 4.] Mr. Daza responds that Defendants do not specify how the Facebook feed is "not authentic," nor do they dispute that "the Facebook feed is that of Mort-Jones." [Filing No. 81 at 8.] The Court agrees with Defendants, and finds that the Facebook feed document is not authenticated and is inadmissible.

Seventh, Defendants object to a Report from the Indiana Inspector General regarding Troy Woodruff, [Filing No. 72-36], because it "is impermissible character evidence, is unfairly prejudicial to the Defendants, is inadmissible hearsay, and is irrelevant." [Filing No. 78 at 4-5.] Mr. Daza responds that the report "is evidence that Woodruff brought disrepute to the agency, by being investigated for possible criminal violations but was not warned, counseled, disciplined, suspended, or terminated, whereas Daza, who was not accused of any criminal violation, was terminated for bringing disrepute to the agency, which was a false allegation against him." [Filing No. 81 at 8.] To the extent Mr. Daza relies upon Mr. Woodruff as a comparator, the Court will consider this evidence below.

Finally, Defendants object to a document that purports to be the Twitter feed of T.J. Brink, [Filing No. 72-73], because it has not been authenticated, is inadmissible hearsay, is unfairly prejudicial, and is irrelevant. [Filing No. 78 at 5.] Mr. Daza argues that Defendants do not make a specific objection as to how the document is not authentic, do not dispute that it is the Twitter feed of Mr. Brink, and do not make "any specific effective objection." [Filing No. 81 at 9.] As discussed below, the Court considers this evidence but ultimately concludes that it is not relevant to Mr. Daza's claims.

### C. Statement of Facts

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### 1. *1993-2010*

Mr. Daza began working as a geologist for INDOT in June 1993. [Filing No. 72-11 at 4-5.] Along with his duties as a geologist, Mr. Daza was the supervisor of the Independent Assurance Program, which is a federally-mandated program that requires certain qualifications for individuals to conduct testing of construction materials. [Filing No. 72-11 at 4.] In March 2006, Mr. Daza's position was reclassified to a Geologist 2 and he received a 15% salary increase. [Filing No. 72-3 at 2.] Mr. Daza's supervisor told him at the time that the pay increase was due to his excellent performance. [Filing No. 72-3 at 2.]

In September 2009, former Republican Indiana State Representative Troy Woodruff was appointed as District Deputy Commissioner ("DDC") of the Vincennes District of INDOT where Mr. Daza worked. [Filing No. 72-3 at 4-5.] In August 2010, Mr. Woodruff was promoted to INDOT Chief of Operations, and Russell Fowler, a personal friend of Mr. Woodruff, was appointed as DDC of the Vincennes District. [Filing No. 72-3 at 5.]

### 2. *2011: Mr. Daza Complains Regarding Treatment of Terry Goff*

In 2011, Director Shane Spears told Mr. Daza to talk to an INDOT employee that Mr. Daza supervised, Terry Goff, because INDOT's Human Resources Manager (a Republican and the wife of the Knox County Republican Party Chairperson) had inquired regarding Mr. Goff's Facebook page and commented that she had heard it contained political posts. [Filing No. 72-4 at 1-2; Filing No. 72-11 at 39.]

On August 9, 2011, Mr. Goff complained to INDOT Director Valerie Cockrum regarding not receiving a promotion. [Filing No. 72-18.] Mr. Goff wrote in an email to Ms. Cockrum:

> To no surprise, I was informed of the decision on filling the ETS slot in our department. I feel that I need to meet with Rusty to discuss a few things. Brent knows how I feel and I wanted to follow a chain of command before talking to Rusty….

On kind of the same note, I wanted to talk to you about the actions of [one of the interviewers] during my interview. I had already discussed this issue with [Mr. Daza] and decided I would not say anything until after the selection was made. He basically asked me to follow through you instead of confronting her directly. During the interview, she was texting on her phone. I asked Brent if he saw it and he did not. She was sitting to my left and had her phone in her lap where neither of you would have seen it. The problem with that is that shows a total lack of respect and should have never taken place. I went through the exact same thing when I interviewed…for the ETS slot previous and again something like this takes place.

I in no way want you to think that I am upset with your or Brent. It just feels like I do an excellent job and keep getting kicked in the face and it is really hard to keep doing a good job.

[Filing No. 72-18 at 1-2.][2]

Ms. Cockrum responded:

Terry, I hear what you are saying about not being selected for the position and I appreciate you following the chain of command. No, I didn't see [the interviewer] texting during the interview but will follow up on that. Thank you.

[Filing No. 72-18 at 1.]

On August 14, 2011, Mr. Daza sent a lengthy email to Ms. Cockrum regarding Mr. Goff not receiving the promotion for which he had applied. [Filing No. 72-19.] Mr. Daza set forth why he thought Mr. Goff was a good candidate, and why he was the "logical and best choice" for a prior promotion. [Filing No. 72-19 at 1.] He also discussed his belief that Mr. Goff did not get the promotion, and other past promotions, because he is a Democrat, stating in part:

Now why is Terry so poisonous? Because he is a Democrat. Terry was well connected in the Democrat party but what did he get for it. Let's see, the Democrats were in power for 16 years and Terry got an entry level job 19 years ago, that's it. No promotions, no big raises. He's not even the highest paid tech. As a matter-of-fact he is way underpaid. I am not naïve. I have been in INDOT for 18 years. Politics has always been played but not really in promotions in Testing, just entry

---

[2] Mr. Daza states in his response brief that "In August 2011, Goff complained to Director Valerie Cockrum that he was denied a promotion due to political discrimination," and cites to the August 9, 2011 email. [Filing No. 73 at 6.] But, as set forth above, the email does not mention "political discrimination" or anything about politics.

level…. The only other opportunity for Terry was the Prestressed/Steel Supervisor job. Terry was the best choice. I know the man picked has experience in the steel industry and will probably be ok but the few promotions available to Testing shouldn't be handed outside our Department if we have suitable candidates from within and we had one excellent candidate, the best in the Department. You can't go around slapping our best tech in the face multiple times (which you have done twice) and expect him to take it. We're going to lose him or at least you will ruin him. He'll stop caring or trying. You want Testing to run on a skeleton crew. We can pull it off as long as you allow us to put the right people in the right slots, but you guys can't keep from interfering. And all because of one reason, Terry's politics. Mark quit in part because of this crap. Mark is a Republican and you guys couldn't help but screw with him too.

[Filing No. 72-19 at 1-2.]

Ms. Cockrum responded:

I will keep this to myself and won't forward unless you want me to for some reason. I always appreciate your total honesty Pete. And, your support for Terry is commendable.

[Filing No. 72-19 at 1.]

On August 15, 2011, Mr. Goff emailed Mr. Fowler, DDC of the Vincennes District, regarding not receiving the promotion for which he had applied. [Filing No. 72-20 at 2-4.] Mr. Goff outlined his qualifications and accomplishments while at INDOT. Mr. Goff then wrote, in part:

My job performance has not been affected by the party holding office. I have continued to educate myself and be an asset to INDOT. Politics should not be the deciding factor when promotions come up. And NO political party should be proud of hiring or promoting under-qualified staff.

\*             \*             \*

I am neither a woman, a person of color, American Indian or any other minority but I am sure I am being discriminated against because of my political affiliation.

I am certain I was the most qualified of the internal applicants and I am 95% sure I was selected. So why would I continue to be the BEST technician in our department when being the best gets you absolutely no where (sic)? I ask you this……Did our Civil service training mean nothing? During the Training, it was stated that "evaluations are heavily weighed when a promotion is being considered".. (sic) obviously the Vincennes District is exempt from this.

[Filing No. 72-20 at 4.]

Mr. Fowler responded to Mr. Goff, stating:

I certainly understand disappointment when not being selected for a position – many of us can relate to that. A common misconception is that INDOT experience makes a candidate a "shoe-in" for a position. In fact, other things impact the decision: communication, team skills, personality, attitude, capability, performance, etc…..

I respect the fact that you have done very well in department ratings and pay for performance – that is commendable…..

While I cannot speak specifically for my predecessors – as I was not privy to the references in your e-mail – I have the utmost confidence that they made the best decisions for the agency at the time as required. Our focus is always to hire well-rounded people who add value to the agency.

[Filing No. 72-20 at 2.] Mr. Fowler did not investigate Mr. Goff's complaints of political discrimination. [Filing No. 72-4 at 3.]

In December 2011, Mr. Daza completed a performance appraisal for Mr. Goff and gave him an overall rating of "outstanding." [Filing No. 72-11 at 7-8.] Shortly thereafter, Mr. Woodruff emailed Mr. Fowler and Ms. Cockrum, among others, regarding Mr. Goff's performance appraisal, and wrote "How can you constantly complain about everything and be considered an[ ] outstanding employee? Somebody needs this one explained or changed." [Filing No. 72-21 at 3.] Mr. Fowler responded that he "questioned this one as well," and Mr. Woodruff wrote "An outstanding employee needs to be outstanding in every way. I will leave it to you guys to decide what his level should be, but it's not outstanding and I would question if it should be exceeds either." [Filing No. 72-21 at 2.] Mr. Goff's performance appraisal ultimately reflected an overall rating of "Exceeds Expectations." [Filing No. 72-11 at 8; Filing No. 72-23 at 7.]

### 3. 2012-2013: Mr. Daza is Disciplined for Complaining About Phone Policy

In May 2012, Mr. Woodruff was promoted to Chief of Staff at INDOT. [Filing No. 72-3 at 5.] In 2013, due to heavy construction on the I-69 corridor through the Vincennes District, the District was especially busy. [Filing No. 49-21 at 2.] As a result, Mr. Fowler informed his subordinates that anyone with an INDOT-issued cell phone would be required to be available for phone calls after regular business hours to ensure that construction could continue without delays. [Filing No. 49-21 at 2.] This was not an expectation that INDOT employees be on call 24/7. [Filing No. 49-24 at 5.] Mr. Daza complained about the directive, and explained to employees that it was not part of his job to work overtime or work on the weekends, "like construction and emergency personnel did." [Filing No. 72-3 at 13-14.] About a week after Mr. Daza made those statements, his supervisor at the time, Brent Schmitt, asked him to answer calls after hours. [Filing No. 72-3 at 13.] Mr. Daza ultimately complied and answered calls after hours, for which he received no additional compensation. [Filing No. 72-3 at 14.] INDOT issued a Written Reprimand, in which Mr. Schmitt described Mr. Daza's unacceptable behavior as follows:

> On March 8th, 2013 Pete Daza and I sat down to discuss comments that he made at the spring construction conference for I-69. During the construction conference Mr. Daza made the statement that he would not follow the expectation of carrying his state issued cell phone after hours, set forth by the Vincennes DDC Rusty Fowler. I informed Mr. Daza that his expression of defiance in front of the employees he supervises, the members of the construction staff, and other directors did not exhibit the professional and leadership qualities that are expected of a supervisor in this department and agency. I informed Mr. Daza that the expectation to have his cell phone on him for urgent matters after hours was an expectation from both Rusty and I. Mr. Daza then repeatedly informed me he would not follow the expectation set forth by Mr. Fowler and that I could not make him. This defiant and insubordinate behavior is not acceptable nor does it reflect the core four principles that all employees of this agency are expected to exhibit, especially supervisors.

[Filing No. 72-26.]  The Written Reprimand is signed by Mr. Daza.[3]

In August 2013, the *Indianapolis Star* published a story entitled "INDOT official benefited from his and his family's sales of land along I-69 route," which discusses Mr. Woodruff's sale of a piece of land to the state as part of the I-69 expansion project.  [Filing No. 72-25.]

In December 2013, Mr. Daza was nominated for a Department Leadership Award.  [Filing No. 72-27 at 6.]  Via email, Ms. Cockrum confirmed for Mr. Fowler that Mr. Daza was eligible for the Department Leadership Award even though he had received a written reprimand.  [Filing No. 72-27 at 4.]  Mr. Fowler responded "Excellent.  I concur with Pete's contribution."  [Filing No. 72-27 at 4.]  Mr. Fowler stated that Mr. Daza "is a sharp guy & is a huge asset to us; he still needs some soft skill tweaking."  [Filing No. 72-27 at 2 (emphasis omitted).]

Mr. Daza's 2013 Performance Appraisal Report was complimentary of his knowledge and work and reflected all "meets" or "exceeds" expectations ratings, but also noted that: (1) "Although Pete is willing to lend a hand and work with others in and out of his specific job duties, Pete often struggles to work as fiercely or cooperate as well if the assignment is one that he does not agree with or find necessary"; (2) "Pete sometimes can and does allow his passion for his work to detract from the very positive and forward thinking ideas that he has.  Pete always fulfills the needs of the customer but could improve upon his method of delivery and professionalism"; (3) "Most of the

_____

[3] In his response brief, Mr. Daza states that Mr. Fowler testified in his deposition that Mr. Daza's "concerns" regarding being required to answer his cell phone 24 hours a day "were legitimate." [Filing No. 73 at 7.]  But the portion of Mr. Fowler's deposition transcript to which Mr. Daza cites does not support Mr. Daza's assertion.  Instead, in response to Mr. Daza's counsel's questions regarding the need to pay employees overtime if they were required to answer their calls 24/7, Mr. Fowler testified that supervisors generally were the individuals who were called after hours, that they are not always eligible for overtime, and that there were ways to compensate individuals who ended up having to work after hours such as through flex time (*e.g.*, taking two hours off the day following an evening of working two hours during the night).  [Filing No. 72-15 at 9.]  The Court does not read this testimony as Mr. Fowler "admitt[ing] that [Mr.] Daza's concerns were legiti-mate."  [Filing No. 73 at 7.]

time Pete openly supports changes, however on one occasion earlier in the year Pete expressed dissatisfaction with a change that was made in the wrong environment.  This event was addressed with a written counseling then a written reprimand and there have been no issues since"; (4) "It has been observed that during this review period that while being capable of arriving at fact, data based solutions, Pete could work on approving (sic) his ability to be objective, forward thinking, and critical of others (sic) ideas and opinions while remaining professional and respectful"; and (5) "On at least two occasions this year I had discussions with Pete about remaining professional [and] respectful when dealing with colleagues."  [Filing No. 49-6.]

### 4.  *2014:  Mr. Daza Defends Mr. Goff's Refusal to Plow Snow Due to Illness*

In early March 2014, Mr. Schmitt emailed Mr. Daza regarding Mr. Goff's refusal to come to work to help plow snow because he had shingles.  [Filing No. 72-29 at 3.]  Mr. Daza responded that Mr. Goff ultimately came in to plow, so would not need a doctor's note, and that Mr. Goff "is allowed one mandatory OT refusal in a six month period so he is going to use it."  [Filing No. 72-29 at 3.]  Mr. Daza also emailed Ms. Cockrum and stated:

> If someone has a medical reason they cannot plow and they have a doctor's excuse how can a refusal be issued?  If you get two refusals disciplinary action is warranted.  So if Terry were to have the flu, let's say, and he was called to plow again and couldn't they will issue a second refusal and write him up?  Valid medical reasons should not subject the employee to refusals and consequently disciplinary action.  If you extrapolate this out he could ultimately be fired if he continually was sick over a course of a snow event.  Is it our position that Terry should know when a snow event is to occur, and since it is his duty to plow, only get sick when the weather is good?  How dare he have an illness during snow season?  Look at how we treat our people.  Maintenance is out of control.

[Filing No. 72-29 at 3.]

Ms. Cockrum responded that she would "find out what the directive is on this today," and later emailed Mr. Daza and wrote:

Yes, a doctor's excuse may not exclude an individual from plowing snow. A doctor's excuse may not necessarily exclude the individual from receiving a first notice of refusal. However, a doctor's excuse could exclude an individual from disciplinary action if his/her condition was serious enough to warrant work restrictions which would include snow plowing.

Although Terry received a corrective action form for his first refusal, he will not receive a penalty (Written Reprimand).

Also, someone in upper management saw Terry at a ballgame in Richmond Saturday so that is not helping the perception of the situation because the thought is "if he could drive on Saturday what happened on Sunday?" I know that may be out of context as to actual events but that is the general feeling.

[Filing No. 72-29 at 1-2.]

Mr. Daza responded to Ms. Cockrum:

An illness can happen suddenly. Just because an individual is fine on one day doesn't mean he is faking it if an illness strikes the next. The last time he had a shingles outbreak he had a rash for several days he commented on before he finally went to the doctor. By the time he went the rash had increased in severity and was quite painful so, to address the comment below, you could have saw him out for several days appearing ok then overnight he is incapacitated. None of this is out of the realm of possibility and since no one is a medical doctor within INDOT and therefore not qualified to make such judgments, people's "general feelings" should not play into any evaluation of the situation when medical issues are concerned.

[Filing No. 72-29 at 1.]

Later that same day, Human Resources Manager Nina Daniel emailed Jeff Sullivan[4] regarding Mr. Daza. [Filing No. 72-30.] Ms. Daniel wrote that Brent Schmitt had discussed with her several issues regarding Mr. Daza, most of which were behavioral. [Filing No. 72-30.] She stated that although Mr. Daza's job knowledge is "one of the best in the state," "his professionalism and interaction with [Mr. Schmitt] has become…'a cancer on the department.'" [Filing No. 72-30.] Ms. Daniel wrote:

---

[4] Jeff Sullivan's title is not clear from the record, but the Court surmises from the context of communications with him that he is a human resources employee or consultant.

Brent feels that Pete tries to usurp his authority especially with departmental em-
ployees. I think the back story is that Pete was up for or wanted the position that
Brent now holds. Pete was not qualified because he does not have a[n] engineer's
license. Everyone agrees that Pete is more knowledgeable than Brent in some ar-
eas, even Brent acknowledges this. However, I find Brent to be very personable,
in tuned and onboard with where SPD and INDOT are moving toward culturally.
He's a smart young man that will eventually grow into the position with the right
support.

Yesterday Rusty [Fowler] asked me to sit in on a discussion about Pete. Val
Cockrum and Brent were also present. They are all in agreement that something
has to give. I ask if Pete was salvageable and got a lukewarm response. Everyone
seems exhausted with the situation.

My take is if he is salvageable than we need a CTI meeting. We need to set specific
expectations about his behavior and what that should look like. All three state that
this has been addressed with Pete and while his behavior seems to improve for a
few weeks it doesn't take long for it to tank again. I then offer that they should just
have a frank discussion with Pete and ask if he is happy here. If he says "Yes" than
(sic) we set guidelines and expectations for him to continue in his current position.
If he says "No" we ask why. If his reasons are things we can help correct we make
a plan, if not, we help him form an exit strategy. All respond that sometimes Pete
will simply shutdown and not give any input. My understanding is this has hap-
pened twice. I suggested that if that happens we simpl[y] tell Pete that we are giving
him an opportunity to express his thoughts and that a decision will be made with or
without his input. We prefer he has input.

So, here's my/our question to you. If Pete is not happy or if the final decision is
that this position is not the "right fit" does Pete have any options for moving to
another district? Currently Rusty is not interested in having Pete remain here if he
has to remove him from his current job. What options are there?

Side note: I have very little on file discipline wise. I have attached what I have
which is indicative of a continued pattern of behavior. Unfortunately the largest
portion of it was not formally documented….

[Filing No. 72-30.]

On March 26, 2014, Mr. Daza sent a lengthy email to Ms. Cockrum regarding Mr. Schmitt,

his supervisor. Mr. Daza wrote, in part:

Ok I have some real issue[s] with today. First do you really think I am going to get
into Brent's failings again? What can he do better? How about quit. If not that
then let's see actually come to work, do his job and the list goes on. [Employees in
Testing] do not trust Brent and they don't really trust you. The last time he asked

us "what could he do better" [one employee] told Brent he needed to start coming to work which didn't go over well. Nobody likes, trusts, or respects Brent in Testing and that holds true for big parts of Construction as well. That won't change. He is who he is. Testing doesn't dislike you and some really like you but they do not trust you as it appears to them you think Brent is great. They are all puzzled how you can think that when he doesn't even come to work. Anyway, you will get very little honest feedback on that line of questioning. You want to know the truth you'll have to ask them by yourself and maybe they'll talk.

[Filing No. 72-31.] Mr. Schmitt resigned from INDOT in April 2014, and began working for the new Republican Mayor of Evansville as a City Engineer. [Filing No. 72-3 at 17.]

Around this time, Mr. Daza also complained about the performance of a geologist in the Seymour District, Chris Bell. [Filing No. 72-3 at 7.] In a March 26, 2014 email, Mr. Daza complained about Ms. Cockrum volunteering him to mentor Mr. Bell without asking Mr. Daza first. [Filing No. 72-31.] He also stated:

Testing employees know we are the best, strive to continue that trend and always do an excellent job but they feel insulted by Brent's view and leadership (lack of mostly as he has no idea how to lead). I can only conclude that you take Brent's view of us. Don't think I don't see this as setting me up for bad evaluations and work improvement plans. If Brent knew of this beforehand he knew damn well how I was going to react. Since I won't buge (sic) on this issue over[ ] mentoring Seymour's geologist, my time with testing is obviously limited.

[Filing No. 72-31 at 1.]

In April 2014, T.J. Brink was hired as the Safety Director in the Vincennes District. [*See* Filing No. 72-33.] Mr. Brink listed under "Professional Experience" on his application Director of Business Development for the Southwest Indiana Regional Youth Village. [Filing No. 72-32.] When Mr. Brink applied for the Safety Director position, he was a member of the Vincennes City Council. [Filing No. 72-32 at 1.] Ms. Daniel sent an email to Jeff Sullivan regarding whether there was an ethical issue with hiring Mr. Brink, since he was on the Vincennes City Council. [Filing No. 72-33 at 3.] Mr. Brink was ultimately hired. [Filing No. 72-3 at 8.]

In July 2014, Mr. Woodruff resigned from INDOT after an investigation by the State Inspector General regarding Mr. Woodruff's sale of land to the State of Indiana related to the I-69 project. [*See* Filing No. 74-2.] The Inspector General concluded that it agreed with decisions by the Marion County Prosecuting Attorney Office and a Special Prosecuting Attorney appointed in Daviess County that prosecution of Mr. Woodruff was not warranted, and also with a federal entity's conclusion that "land valuations regarding the I-69 Project were in 'substantial compliance with federal requirements.'" [Filing No. 74-2 at 2.] The Inspector General did make several recommendations, including that "INDOT not permit [Mr. Woodruff] to profit from INDOT funds through re-employment with the agency or through any form of contracting with the agency for at least one year after leaving state employment due to his failure to follow the advice given by the INDOT Ethics Officer to disclose the eminent domain action to the State Ethics Commission." [Filing No. 74-2 at 2.]

On July 31, 2014 – Mr. Woodruff's last day as an INDOT employee – Mr. Goff sent Mr. Woodruff an email stating that Mr. Woodruff was to blame for corruption at INDOT. He wrote:

> You talk about the media portraying INDOT as being corrupt. This is TRUE. You are part of the reason that corruption exists. I for one think you are the pot calling the kettle black. Going to a consultant when you yourself made a big deal out of one of our BEST PE's wanting to go to work for a consultant. It was unethical for him and now not for you. WOW!!!! Now for the corruption YOU have created. You were not hired because of your job knowledge. It is because of the favors you had done for then Governor Daniels. I know that you have been personally involved in a screaming match at the district to rate me as below standard and I missed out on promotional opportunities in our department even though I had been selected. You have cost me a total of 17% in pay raises. ALL BECAUSE OF MY POLITICAL VIEWS. I hope that the corruption that you have brought to INDOT leaves when you are gone.

[Filing No. 72-37 at 2.]

Mr. Woodruff forwarded Mr. Goff's email to Mr. Fowler and stated "First off I don't know what he is talking about, but this may be one of the guys sending stuff to the media. At any rate

wanted you to be aware he obviously thinks he works for a corrupt organization." [Filing No. 72-37 at 2.]

Mr. Daza received praise regarding his work from Ms. Cockrum and Ms. Daniel in late 2014. [Filing No. 72-38 (Ms. Cockrum emailed Mr. Daza in response to his submission of a fuel savings plan, stating "Well done Pete"); Filing No. 72-40 (in response to a lengthy email from Mr. Daza to Ms. Cockrum regarding savings in fuel and maintenance costs and observations regarding INDOT's productivity, Ms. Cockrum responded "Nice!"); Filing No. 72-44 (in response to an email from Mr. Daza to Ms. Daniel attaching some performance reviews for INDOT employees, Ms. Daniel wrote "First, let me say your evaluations are very well done. I always appreciate your thoroughness and insight. I do want to challenge you for a moment to review your ratings and let me know if you still feel the same after reading the information below." Ms. Daniel set forth the meanings of the different performance ratings and wrote "With this in mind, would you still rate Carla, Clint, and Tim the same? Can you give me an example of how the Exceeds or Outstanding applies to the employee receiving that rating?").]

### 5.   2015: Mr. Daza's Mother Writes a Letter to the Editor, Mr. Daza Defends a Co-Worker Involved in an Accident, Mr. Daza is Disciplined for a Respirator Incident, and Mr. Daza is Terminated

Mr. Daza continued to receive compliments regarding his work in 2015. [See Filing No. 72-45 (In response to information provided by Mr. Daza in emails, Ms. Cockrum responded "Wow. This looks very, very good. I think you are spot on in identifying results for each expectation," and "It is noted the effort all of you put into this. Excellent work"); Filing No. 72-47 (Mr. Fowler stating in an email "Pete, I appreciate the discussion today. You took full accountability as a leader for the challenge at hand, and came prepared with a plan. That is commendable – great job! Thank you!"); Filing No. 72-49 (in response to an email from Mr. Daza, Ms. Cockrum stated

"Pete, as always excellent job working up this concept"); Filing No. 72-50 (in response to an email from Mr. Daza, Ms. Cockrum stated "I am not surprised by your result. You are the most results oriented person I have ever met!"); Filing No. 72-52 (email from Ms. Cockrum to Mr. Daza stating "Good interaction with Bob today. You know your stuff"); Filing No. 72-53 (Ms. Cockrum responding to an email from Mr. Daza, "Well done!").]

On October 1, 2015, Mr. Daza emailed various INDOT personnel advising that "Stephen Day hit a downed tree branch and broke off the side mirror of the state vehicle on 9/29/15. Enclosed are the accident forms related to the accident." [Filing No. 49-17 at 3.] Mr. Brink responded, "this is a preventable accident. He will also need to fill out the form completely. What was his speed? This is left blank." [Filing No. 49-17 at 3.] Mr. Daza responded:

> Stephen was driving on US 50 west of SR 37 coming out of a curve. A limb was down and sticking out into his lane. There was oncoming traffic. It was raining. He was doing 50 mph. He has no place to go. US 50 is not roomy over there. Locking up the brakes and trying to stop is not smart as he could lose control of his vehicle. He does not swerve. If he did he would hit the oncoming traffic. He did the safest thing one could do in this situation – take the hit. If the accident is preventable then what should he have done? I cannot explain what else he should have done. I have no other answer than the action he took. He responded exactly how we tell people to – do not swerve to avoid a collision.
>
> Below is the corrected accident report, and what the Lawrence County Sheriff's department provided me. They do not provide the actual accident report. If we want that we have to go to buycrash.com and purchase a copy. That is what they told me.

[Filing No. 49-17 at 3.]

> Ms. Daniel responded:
>
> If Stephen was doing 50 coming out of a curve and it was raining I would suggest that he was traveling too fast for the road conditions and therefore the accident was preventable. I would also be inclined to review Stephen's phone to ensure he was not texting as this has been an issue in the past.

[Filing No. 49-17 at 3.] Mr. Daza then wrote:

Speed limit is 55 so he was under the speed limit. Furthermore, if he was doing 35 could he have stopped in the middle of the road before hitting the limb? And if he did stop wouldn't he be putting himself and the motoring public in danger of a rear end collision. He is stopped and someone comes out of the curve and is going the speed limit or higher and cannot stop in time or hydroplanes because they lock up their brakes and causes a severe wreck. Again, his course of action was the safest given the situation. Finally, his cell phone is his and what right do I have to look at his personal cell phone. That requires a warrant in the law enforcement community.

[Filing No. 49-17 at 2.]

Mr. Daza and Ms. Daniel continued to email back and forth regarding whether the accident was preventable, with Ms. Daniel arguing that it was and Mr. Daza defending Mr. Day. [Filing No. 49-17 at 1-2.] Mr. Daza also emailed Bill Tompkins, a Testing Engineer at INDOT, and Ms. Cockrum, stating "This is ridiculous. How many man hours are we going to spend on this? They just want to fire him." [Filing No. 49-17 at 1.]

On November 22, 2015, a letter to the editor written by Mr. Daza's mother which was critical of then-Indiana Governor Mike Pence's position on immigration was published in a news-paper. [Filing No. 72-54 at 2 (letter from Marjorie D. Melvin titled "Pilgrims to this land were refugees, too").] Mr. Daza discussed his mother's letter with Ms. Cockrum and other INDOT employees. [Filing No. 72-3 at 9; Filing No. 72-11 at 10.]

Two days later, Mr. Brink went to Ms. Cockrum's office to discuss a concern he had with Mr. Daza. [Filing No. 72-59.] Ms. Cockrum memorialized the meeting in the following notes:

On November 24, 2015 TJ Brink, Vincennes Safety Director, came to my office to discuss a concern he had that Pete Daza and Nicole Wedding had checked out respirators from the stockroom after being told during the OSHA training not to use the respirators as they did not meet OSHA regulation. People needing respirators are to be fitted in order to receive the proper safety benefit. TJ was very upset and stated he thought Pete had purposely checked the respirators out knowing it was prohibited to do so. I pointed out the respirators had been checked out prior to the respirator portion of the OSHA training by one day but would take care of notifying people to not use them and to return them if they had checked one out recently. TJ was not happy with Pete's behavior or responses to TJ's questions during the OSHA

training. He felt that Pete's attitude towards him was poor and that Pete was a bad influence on Clint Morgan. Clint works with Pete in the Testing Department. We talked about Clint as well and how he responded to one of TJ's questions during the training. TJ also felt that Clint was disrespectful in the way he answered TJ's question. I explained that Clint truly didn't know our policy on how to work with an OSHA inspector and his response was just an honest observation.

TJ has expressed his feelings about Pete's behavior in the past stating that Pete's negativity was not in align (sic) with INDOT's new culture.

After the Thanksgiving break I met with Pete and Clint on November 30, 2015 to discuss the incident with TJ during the OSHA training. I met with Pete first explaining that he had upset TJ and not for the first time. The first incident occurred over Pete's refusal to change an accident from unpreventable to preventable. I explained he should no[t] further antagonize TJ in any way. I talked about TJ's position as director and as a Director myself with the Testing Department being under me, I could not help him out if he further decided to choose to go down this route with TJ. I warned him that he was making an enemy out of TJ as it stood and I offered that talking to TJ might clear the air and would help TJ understand the situation. Pete stated he wasn't going to talk to TJ. He did apologize to me about the incident.

*       *       *

The point of this statement is to document a conversation held on November 30, 2015 where Pete was warned about creating a situation with another employee, a Director of the Vincennes District. On December 3, 2015 we received an observation of another similar incident involving Pete during a Beyond the Appraisal training in the Seymour District.

[Filing No. 72-59.] Ms. Cockrum also testified that she told Mr. Brink she could not support Mr. Brink's allegations. [Filing No. 72-13 at 5.] After her conversation with Mr. Brink, Ms. Cockrum warned Mr. Daza to stay away from Mr. Brink, to not antagonize him in any way, and that "a politically powerful person was out – was headed at [Mr. Daza] and was going to give [Mr. Daza] a lot of trouble." [Filing No. 72-11 at 7.]

On December 1, 2015, Mr. Daza attended a training session. [Filing No. 72-11 at 13-14.] When Mr. Daza arrived at the training, he thought that the trainer, Sheryl Proctor, did not like him and gave him "dirty looks." [Filing No. 72-11 at 13.] Mr. Daza "engaged in the training," [Filing

No. 72-3 at 11], although he did "close[ his] eyes from time to time without reading glasses, and…did not say much," [Filing No. 72-3 at 22]. Mr. Daza's then-supervisor, Testing Engineer Bill Tompkins, was sitting at the same table as Mr. Daza at the training, and did not notice anything "out of the ordinary" or inappropriate. [Filing No. 72-12 at 3-5.]

Ms. Proctor wrote down her observations from the first day of training. [Filing No. 72-55.] She stated:

> Pete arrived at the same time with Bill and Tim. Britni and I exchanged introductions with the group. Bill and Tim engaged in conversation, but Pete said nothing other than his name.
>
> During the training, Pete frequently leaned back in his chair with his arms crossed over his chest. He did not take notes or follow along too often in the binder of handouts. Several times he closed his eyes.
>
> Incident to be reported: Participants were asked to take a 5x8 card and write a brief recognition note that they would deliver verbally to someone the next day. They were told that we would share these notes with a partner for discussion. Pete sat with arms folded and did not participate. All 29 other participants were writing. Since his table had 5 people, I moved over to pair up with someone during the partner activity portion. I paired with Pete's boss Bill Tompkins. Pete was paired with his peer, Tim Mercker.
>
> I was eager to observe how Pete might participate since he wrote nothing on a card. Even though I was working with my partner, I glanced at Pete and heard him say to Tim, "This is f _ _ _ ing gay."[5] I could not hear his partner's response, but his partner did go on to share the recognition he had written.
>
> Once I finished with my partner, I turned to Pete (both others could hear me) and asked "I noticed you didn't write a recognition note, is there a reason why?" He replied (paraphrased) "I don't need to do this. I tell my guys when they do a good job. It's all in my head. Why do I need to write it down?"
>
> His supervisor, Bill, said, "That's right, Pete is good at giving feedback to his guys." I asked Peter how many direct reports he had and he said "Three". Bill then added, "Actually he oversees way more than that and he does a good job with all of them."

---

[5] Mr. Tompkins testified that he did not hear Mr. Daza say this, but that he was "engaged with the – with what [the trainer] and I were discussing, and I didn't – I didn't hear him say anything." [Filing No. 72-12 at 4.]

At that point, the training resumed.

Additional note:  Pete again had his eyes closed when the facilitator asked partici-
pants to pull out the evaluation form to complete.  He 'woke up' while everyone
was writing, looked around, but did not pull out the form to complete.

[Filing No. 72-55.]

Heather Devocelle, Ms. Proctor's supervisor, emailed Ms. Proctor's notes to Eric Kleinert,[6]

and stated "Here is one page of notes regarding Pete.  I would like to have this addressed and I'm

trying to determine best next steps.  I don't want Pete coming to Day 2 'as is' so I need to work

quickly.  Who should I work with?  Vincennes and Seymour share Bill Tompkins and then he

reports to Val and Becky.  These folks sit in Vincennes though.  Thanks for your help."  [Filing

No. 49-12 at 1.]  The email eventually reached Mr. Fowler, who forwarded it to Ms. Cockrum and

Ms. Daniel and wrote "Please see attachment.  We need to sit down with Nina on Monday &

determine next steps.  This behavior from Pete, as a supervisor, & reinforcement from Bill, as his

Supervisor, troubles me greatly.  To say my patience is worn thin with Pete is grossly understated."

[Filing No. 49-12 at 1.]

On December 7, 2015, Ms. Daniel emailed Employee Relations Specialist Suzanne Kent

and Mr. Kleinert regarding Mr. Daza's behavior at the training session.  [Filing No. 72-60 at 10-

11.]  Ms. Daniel wrote, in part:

Mr. Daza is a Geologist 2 for the Vincennes District.  While his work ethic and
knowledge cannot be denied; his behavior and attitude have been called in to ques-
tion several times.  Mr. Daza's inappropriate behavior was brought to my attention
as early as 2/18/14, the day after I arrived in the district….  Pete's then manager,
Brett Schmitt, submitted his resignation soon after on 4/10/14.  Pete's behavior was
not addressed by Mr. Schmitt and later discussions with Pete brought Mr. Schmitt's
performance as a manager in to question.  Pete's behavior did improve, but contin-
ued to be on the edge of arrogant and insubordinate.

---

[6] Mr. Kleinert appears from the context of the emails to be a human resources employee.

On the Monday before the final issue brin[g]ing this cause of action, Pete's Director, Valerie Cockrum, had a discussion with Pete in which she specifically warned him about "creating a situation with another employee"….

You will also find attached Pete Daza Observation Notes, which are a recount of Mr. Daza's actions during Beyond the Appraisal training on 12/2/15. Additionally I have attached his Written Reprimand from 3/11/13..., Disciplinary Action Justification Form (Pete Daza 12-7-15) and a copy of his 2013 Appraisal which notes Pete's abrasiveness in relating to other employees…..

Although Pete has attended Core4 training, as well as, Act1 training, he continues to exhibit behavior which is not in line with the Culture and professional expectations of INDOT managers. It is the feeling of Rusty, Val and myself that Pete willfully refused to participate in training, used derogatory language, and was disrespectful to his instructors. His behavior is neither modeled nor condoned by the Vincennes Leadership team and can no longer be tolerated.

[Filing No. 72-60 at 10-11 (emphasis omitted).]

Ms. Kent responded to Ms. Daniel as follows:

In review of the information…, the following are my suggestions:

1.  The discipline policy provided is a good resource, but note that it is for classified employees.

2.  Make sure that you are consistent with discipline policies across the district. Have others used derogatory language, not participated in training or crossed their arms during training as we have noted with Pete? If this has happened with other employees, how were they disciplined?

3.  His performance appraisals are very good and there has been no discipline issued for his unprofessional demeanor and insubordination since 2013.

4.  Was Clint disciplined for any inappropriate behavior during the OSHA training? Why was Clint to apologize to TJ if he didn't do anything wrong? Are you wanting to terminate because he refused to admit the incident and apologize to TJ?

His actions dot (sic) contravene public policy and he can be terminated at any time without just cause. But, I would advise that we continue to be consistent with levels of discipline for the same behavior. It would be our recommendation that we give a 3 day or 5 day suspension for his language and unprofessional behavior with documentation in writing that any further behavior of this kind would result in termination.

[Filing No. 72-60 at 10.]   Ms. Daniel responded to several of the questions Ms. Kent asked:

> 2….  We have not terminated an employee for displaying the specific behaviors listed in this item, but have terminated an employee for a continued pattern of negative behavior, which did not conform to INDOT culture.  We feel that Pete shows a continued pattern of negative behavior, which has been brought to his attention on several occasions and yet he refuses to change.
>
> 3….  True, his appraisal are very good and as mentioned earlier [his] work ethic and job knowledge are above reproach.  However, his continued poor interpersonal behavior leaves much to be desired.
>
> 4….  Neither Clint nor Pete were disciplined for this action.  The note was to serve as another instance where Pete was notified that his behavior was less than acceptable.  The fact that two days after this discussion he displayed this type of behavior in a training session seems to be an explanation point.

[Filing No. 72-60 at 10.]

In the same string of emails, Mr. Fowler wrote to Ms. Daniel:

> I have given this great consideration.  Mr. Daza is a leader within INDOT.  With that authority, comes great responsibility – to model the behaviors that we expect of all employees.  His behavior at the training presented by the Talent Management Group last Wednesday was unacceptable; language aside, he sent a clear message that he did not want to be there, & was not going to participate – to the trainers and other attendees.  It must be noted that while his performance has been historically good, in fact above meets last FY, this incident rises to critical level from a cultural standpoint.  We disciplined Mr. Daza in 2013 for failure to live up to Core4 expectations as a supervisor – for exhibiting defiance and below the line behavior in a meeting, not unlike last week.  Mr. Daza was informed at that time that this type of behavior was unacceptable & that future incidents would lead to further action – potentially dismissal.  While I understand the recommendation for suspension, it shows a level of acceptance of this behavior – that it is ok to behave in this manner as a supervisor, and quite frankly, it is not.  I am willing to accept the possibility of SEAC review.  For the reasons noted, I wish to proceed with termination.

[Filing No. 72-60 at 9.]

Ms. Daniel responded to Mr. Fowler "If we do decide to do a 5 day hard suspension and not terminate it is Val's feeling (and I agree) that Pete no longer manage anyone."  [Filing No. 72-60 at 6.]  Mr. Fowler replied "I don't know where we would put him where he wouldn't supervise

people.  Also, I'm not sure that his influence on others will improve.  I still feel termination is the right action."  [Filing No. 72-60 at 6.]

Ms. Kent wrote:

On point #2 you state that this pattern of negative behavior has been brought to Pete's attention on several occasions.  Has this been in writing and with progressive discipline each time the negative behavior has been expressed?  I think this is the part where we are trying to get the agencies on board with disciplining accordingly during the entire process, instead of what appears to be jumping from a written reprimand to termination.  The gap of prior discipline until now can put the agency at a greater risk for having the employee come back with a CS complaint that would potentially have to be settled.  It is up to the agency's discretion on the next step of discipline, but we feel a 3 or 5 day suspension prior to termination would be the better next step so that it is in writing and he is notified with written documentation vs. verbal communication only.

[Filing No. 72-60 at 3.]

Ms. Daniel responded:

You're absolutely on point.  The discussions have not been documented with progressive discipline.  I have reviewed with Val and will be reviewing with Rusty.  Val understands the lack of formal corrective action and would support a 5 day suspension.  She was also adamant that she no longer wants him to have any supervisory responsibilities.

[Filing No. 72-60 at 3.]  Ms. Daniel also wrote to Mr. Kleinert:

Should a termination be supported we plan to emergency suspend Pete and address this termination on Thursday after the I-69 ribbon cutting with the Governor.  While none of us feel that Pete would be violent we also do not want to risk that he would show up and disrupt the ceremony in any way.  We would also need to do this to keep him out of the 12/9 training.

[Filing No. 72-60 at 1.]

Also on December 7, 2015, Mr. Daza sent an email to various INDOT employees under his supervision stating that he had nominated them for "spot bonuses" for their work in "successfully implementing a pavement evaluation SOP to determine whether roads should receive pavement preservation treatments."  [Filing No. 72-58 at 1.]  Mr. Daza had notified employees in the

- 27 -

past when he had nominated them for spot bonuses. [*See* Filing No. 72-39 at 2; Filing No. 72-43.] While notifying employees of their nominations did not violate INDOT policy, Mr. Daza acknowledged that spot bonuses are "supposed to be a surprise" and that not ultimately receiving the spot bonus after being made aware of the nomination "fosters hard feelings and resentment." [Filing No. 72-11 at 56; Filing No. 72-58 at 1.] Ms. Daniel forwarded the email from Mr. Daza to the employees to Mr. Kleinert, and stated:

> I thought I'd share this with you as well.
>
> Pete did not include his Director, Val Cockrum, in the original email, but it was cc'ed to her when [one of the nominated employees] responded. Since Val worked with Pete on the justification for this bonus I think she felt it was a bit underhanded and passive aggressive for Pete to send out such an email when they had not settled on an appropriate bonus amount. Now how is management going to look if the bonus amount is changed or if the bonus has to be denied?
>
> This is typical behavior from Pete. All bonuses have been approved for Testing since I have been here with the exception of two. One was a $250.00 bonus for an employee who decorated their office for Christmas and the other was for employees who did some landscaping around the office area. Therefore, Pete has nothing historical to base[ ] his "if the nomination is denied" statement on. Additionally, he knew the bonus was preapproved although the amount had not been settled on.

[Filing No. 49-8 at 1.] Mr. Kleinert responded "100% concur w/ Val. It is unbecoming conduct and she (sic) be addressed in the term." [Filing No. 49-8 at 1.]

On December 8, 2015, Ms. Cockrum told Mr. Daza that Mr. Fowler had received a request for Mr. Daza not to attend the second day of training on December 9. [Filing No. 72-3 at 21.] When Mr. Daza asked Ms. Cockrum why, she said she did not know and refused to give him any other information. [Filing No. 72-3 at 21.] After speaking with Ms. Cockrum, Mr. Daza asked Mr. Fowler what was happening but he would not give Mr. Daza any information and said that he would meet with Mr. Daza at 3:00 p.m. on December 10, 2015. [Filing No. 72-3 at 21.] On December 9, 2015, Britni Saunders (one of Ms. Devocelle's subordinates) emailed Ms. Devocelle

to let her know that Mr. Tompkins had asked her and Ms. Proctor why Mr. Daza would not be attending the second day of training.  [Filing No. 49-7 at 3.]  She wrote, in part, "I…shared my observations from that day [of training] of his lack of professionalism, disrespect and lack of engagement.  I also mentioned that this behavior had also occurred in a recent Core4 class Pete had participated in.  I described this incident as well….  It was clear in our conversation with Bill that he sees Pete as 'one of his best employees' and he is confused about why he would behave in this way when he had had so much leadership training and is such a competent worker.  Sheryl and I [asked] him if his behaviors indicated high performance to him and he had trouble answering.  We left it at that."  [Filing No. 49-7 at 4.]

On the morning of December 10, 2015, Mr. Daza spoke with Ms. Kent.  [Filing No. 72-3 at 23.]  He told Ms. Kent that he believed he might be terminated based on a trainer's complaint and that the trainer had a problem with his ethnicity.  [Filing No. 72-3 at 23.]  Instead of stating that she would investigate Mr. Daza's complaint of discrimination, Ms. Kent told him to go to the meeting scheduled for later that day.  [Filing No. 72-3 at 23.]

On December 10, 2015, Ms. Daniel emailed Mr. Fowler and Ms. Cockrum and stated:

[J]ust received a call from Eric to let me know that Pete called Suzie Kent.  During the conversation Pete told her that if we did terminate him he would file an EEO claim with his ethnicity being the reason for the termination.  I assured Eric that I find no bases (sic) in this claim and should have no difficulty defending against the charge if Pete did file.

[Filing No. 72-63.]

At the 3:00 meeting on December 10, 2015, Mr. Daza's employment was terminated.  [*See* Filing No. 72-64.]  Mr. Daza was provided with a memo from Ms. Daniel which stated:

On 3/12/13 you received a Written Reprimand for exhibiting defiant and insubordinate behavior by your refusal to follow a direct Agency expectation.  This defi-

ance was exhibited in front of members of the construction staff, as well as, employees you directly supervised. You were reminded that this behavior did not reflect INDOT's Core4 values and was not acceptable.

Your 2013 annual review addressed your struggle to cooperate on assignments you did not agree with (Teamwork) and your need to improve upon your method of delivery and professionalism (Customer Service).

In 2013 you received Core4 Training which set an expectation for all INDOT employees to support a culture of Respect, Teamwork, Accountability, and Excellence (the "Core4 Principles"). In 2014 you received Act 1 training which set expectations for all INDOT employees on how to speak to and work with others and the expectation that employees be accountable for your behavior and actions. Keeping your words and behavior "Above the Line".

On 11-30-15 your Director discussed with you your abrasive interaction with another Director and suggested that you meet with that manager to clear the air, you declined to do so. On 12/2/15 you refused to participate fully in an Agency required training evidenced by your leaning back with arms folded and eyes closed and commenting "this is f[***]ing gay" in reference to one of the training exercises. On 12/7/15 you disseminated…an email to possible awardees concerning an, as of yet, unapproved bonus request. These are all examples of your continued defiance of Agency culture and expectations.

Your lack of judgment and inability to conduct yourself in a manner in which your actions do not bring you or the Agency into disrepute cannot be tolerated.

For the reasons listed above, you are hereby notified that effective immediately your employment with the Indiana Department of Transportation is terminated in accordance with IC-4-15-2.2-24 which states "An employee in the unclassified service is an employee at will and serves at the pleasure of the employee's appointing authority…and may be dismissed, demoted or transferred for any reason that does not contravene public policy."

[Filing No. 72-64.] Mr. Daza's then-supervisor, Mr. Tompkins, was not asked for his input prior to Mr. Daza's termination. [Filing No. 72-12 at 6.] Ms. Daniel, Mr. Fowler, and Ms. Cockrum were not aware of any investigation conducted by INDOT regarding Mr. Daza complaining about discrimination. [Filing No. 72-13 at 16; Filing No. 72-14 at 25-26; Filing No. 72-15 at 15-16.]

### 6. *Charge of Discrimination and Civil Service Employee Complaint*

On December 16, 2015, Mr. Daza filed a Charge of Discrimination with the Indiana Civil

Rights Commission. [Filing No. 48-5.] In the Charge, Mr. Daza wrote:

> I started working for the State of Indiana Department of Transportation in June 1993 as a Geologist. I am of Hispanic and Native American races with darker skin, over 40 years of age with a disability. I had good work performance, and I received performance reviews of meets requirements or above. On December 10, 2015, the Department of Transportation gave me a letter of termination for reasons that were false and discriminatory.
>
> I believe that I am being discriminated against due to my race, Hispanic and Native American, color, darker skin, age, over 40, and disability, which are violations of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended [the "ADEA"], and the Americans with Disabilities Act, as amended.

[Filing No. 48-5.] Also on December 17, 2015, Mr. Daza filed a Civil Service Employee Com-

plaint with the Indiana State Personnel Department, stating:

> 1.  Employee suffered discrimination based on his race, national origin. This discrimination ultimately lead to his termination.
>
> 2.  Employee suffered discrimination due to a partial disability of limited eyesight requiring glasses and the disability of Meniere's disease which lead to his termination.
>
> 3.  Employee suffered age discrimination which lead to his termination.
>
> 4.  INDOT failed to follow their practice of progressive discipline.
>
> 5.  Employee did not violate the Bonus Policy Guidelines referenced in the termination letter.
>
> The basis for each assertion is included in the attachment to this complaint. The employee seeks immediate reinstatement to his position as a geologist for the Vincennes District Testing Department with no lapse in his employment record, full back pay, restoration of this salary with addition of any raise that would be the result of his 2015 fiscal year appraisal, benefits and leave balances.

[Filing No. 48-4 at 1.]

Mr. Daza provided additional details regarding his complaints, including that: (1) his "ethnicity is obvious by both his long dark hair and darker complexion consequently he feels [Ms. Proctor's] disdain must be related to his racial makeup," which "in turn lead to her to complain [he] was not participating in the training"; (2) he "has a stern visage commonly associated with his Hispanic/Native American ethnicity," which includes "appearing angry or disdainful, when, in fact, he is relaxed and calm or just listening as was the case [at the training].... [He] simply exhibits the 'noble bearing' of his ancestors from his father's side"; (3) he "feels he is held to a stricter standard than his younger counterparts"; (4) his dismissal "was in violation of commonly applied practice of progressive discipline. Suspension is generally the next step in the discipline practice. The employee was not suspended but terminated"; and (5) "the Bonus Program Guidelines were in fact not violated and he was in compliance with said guidelines." [Filing No. 48-4 at 3.]

### 7. The Lawsuit

Mr. Daza initiated this litigation on January 31, 2017, [Filing No. 1], and filed the operative Amended Complaint and Demand for Jury Trial on September 6, 2017, [Filing No. 20]. Mr. Daza sets forth claims for: (1) discrimination based on race, color, age, and political speech and association[7]; and (2) retaliation based on Mr. Daza's complaints about discrimination and his exercise of his right to free speech and political association. [Filing No. 20 at 4-5.] Defendants have moved for summary judgment on both of Mr. Daza's claims, and that motion is now ripe for the Court's decision. [Filing No. 46.]

---

[7] Mr. Daza also alleged a claim for discrimination based on disability, but stated in his Statement of Claims that he is no longer pursuing that claim. [Filing No. 39 at 1.]

### D. Discussion

Mr. Daza asserts discrimination and retaliation claims based on numerous characteristics. The Court has done its best to address each of Mr. Daza's theories below. The Court notes at the outset, however, that Mr. Daza has not clearly set forth the provisions under which each of his claims are brought. While the Court assumes that his discrimination and retaliation claims based on his political affiliation are brought under the First Amendment, his race and color discrimination and retaliation claims are brought under Title VII and 42 U.S.C. § 1981, and his age discrimination and retaliation claims are brought under the ADEA, Mr. Daza also references the Fourteenth Amendment in his Amended Complaint, but does not specify what type of Fourteenth Amendment claim he is making. The Court understands Mr. Daza's reference to the Fourteenth Amendment to be a reference to the application of the First Amendment to the states through the Fourteenth Amendment. Out of an abundance of caution, however, the Court notes that any Fourteenth Amendment Equal Protection claims would fail for the same reasons his claims under the First Amendment, Title VII, § 1981, and the ADEA fail. The Court does not discern a Fourteenth Amendment procedural due process claim from the allegations in the Amended Complaint or in Mr. Daza's Statement of Claims. Based on these parameters, the Court analyzes Mr. Daza's claims below.

#### 1. *Discrimination Claims*

##### a. Political Affiliation or Activity

Defendants assert in their Motion for Summary Judgment that they did not violate Mr. Daza's First Amendment rights by terminating his employment, and focus on Mr. Daza's three theories relating to his First Amendment claim – that he was terminated because he is a Democrat, that he was terminated because he defended Mr. Goff (who is also a Democrat), and that he was

terminated because his mother wrote a letter to the editor that was critical of then-Governor Pence's immigration policies. Defendants argue that it is not enough for Mr. Daza to merely show that he is a Democrat, and that in any event Mr. Daza admits that he does not know the political affiliation of any of the Defendants, and has never heard any of them express negative opinions about the Democratic Party. [Filing No. 50 at 12.] Defendants also argue that Mr. Daza's defense of Mr. Goff is not constitutionally protected, and that there is no evidence that it factored into the decision to terminate Mr. Daza. [Filing No. 50 at 12-16.] Finally, Defendants contend that there is no evidence that Mr. Daza's mother's letter to the editor played any role in Mr. Fowler's decision to terminate Mr. Daza, that the evidence shows that Mr. Fowler – the decisionmaker – did not even know about the letter, and that Mr. Daza's theory that the letter played a role in his termination is based on pure speculation. [Filing No. 50 at 16-18.]

Mr. Daza responds that he has more evidence of political discrimination than just the fact that he is a Democrat, that Defendants knew he was a Democrat, and that several INDOT employees are Republicans. [Filing No. 73 at 22.] Mr. Daza argues that evidence of political discrimination includes "the harsh treatment of Daza compared to the favorable treatment of the employees associated with the Republican Party or employees who have not complained about political discrimination," and "the harsh treatment of Daza shortly after his complaints of political discrimination and he and his mother opposing the position of the Governor." [Filing No. 73 at 23.] Mr. Daza argues that his defense of Mr. Goff is constitutionally protected, and motivated Defendants to terminate him. [Filing No. 73 at 26-28.] He also contends that his employment was terminated shortly after his mother's letter to the editor, and that Mr. Fowler "had already called Daza a 'cancer on the department' the year before…, so Fowler did not need the additional influences that [Ms.] Cockrum eventually succumbed to." [Filing No. 73 at 29.]

In reply, INDOT argues that Mr. Daza's claims that his termination was a result of him being a Democrat rely "on wild speculation about the political nature of INDOT," and that "Mr. Daza's speculative gloss on, or personal opinions about, various current and former INDOT employees' motivations and actions does nothing to help answer the question of whether the Deputy Cmm'r terminated Mr. Daza's employment as a result of any protected political activity." [Filing No. 78 at 5-6.] Defendants again note that Mr. Fowler did not know about Mr. Daza's mother's letter to the editor when he made the decision to terminate Mr. Daza, and that there is no evidence that Mr. Daza's support of Mr. Goff played a role in the decision to terminate him. [Filing No. 78 at 6-8.] Defendants also assert that the decision not to promote Mr. Goff was made in 2011, long before Mr. Daza was terminated in 2015, and that Mr. Goff's performance review in 2011 has nothing to do with Mr. Daza's termination in 2015. [Filing No. 78 at 8-9.]

It is well-settled that political affiliation is protected by the First Amendment. *Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017) (holding that government employers may not dismiss public employees on the basis of political affiliation, and noting that "the age-old practice of patronage firings violated the First Amendment") (citations omitted). A plaintiff must also show that he or she suffered an adverse action that presented "an actual or potential danger of deterring or chilling the plaintiff's exercise of free speech." *Graber v. Clarke*, 763 F.3d 888, 899 (7th Cir. 2014) (citing *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995)). "[T]o prevail in a First Amendment claim [based on political affiliation], it is sufficient for the plaintiffs to prove that they were dismissed solely for the reason that they were not affiliated with or sponsored by a particular political party." *Yahnke v. Kane County*, 823 F.3d 1066, 1070 (7th Cir. 2016) (citing *Branti v. Finkel*, 445 U.S. 507, 516-17 (1980)). "In the end, the plaintiff must demonstrate that, but for his protected speech, the employer would not have taken the adverse action." *Kidwell v.*

*Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). The Court considers Mr. Daza's three theories in connection with his political discrimination claims – that he was terminated because he is a Democrat, that he was terminated for standing up for Mr. Goff, and that he was terminated for his mother's letter to the editor.

### i. Mr. Daza's Status as a Democrat

Mr. Daza argues that he has much more evidence than simply the fact that he is a Democrat, and proceeds to list multiple circumstances or events that he contends support his claim of political discrimination. Mr. Daza lists these circumstances or events, but either does not tie them to his termination or does not explain why they are significant. Specifically:

- Mr. Daza refers to the treatment of Mr. Goff and argues that no one at INDOT investigated Mr. Goff's complaints of political discrimination, but he does not explain how this relates to his own termination;

- Mr. Daza discusses his "written and verbal complaints of discrimination to [Ms.] Cockrum" and that Ms. Cockrum thanked him for being honest but refused to investigate his allegations. But the allegations relate to INDOT's treatment of Mr. Goff and Mr. Daza does not connect the allegations to Mr. Fowler's decision to terminate Mr. Daza;

- Mr. Daza cites to Mr. Woodruff's email to Mr. Fowler relating to lowering Mr. Goff's performance appraisal rating after it had already been approved, which was sent shortly after Mr. Daza and Mr. Goff complained that Mr. Goff was facing political discrimination. But this occurred several years before Mr. Daza was terminated. *See Graber*, 763 F.3d at 899 (rejecting political discrimination claim where political speech occurred over six months before suspension and stating "[a]lthough Graber's speech preceded the suspension, without other evidence linking the two events, we cannot find the suspension was motivated by that speech"); *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) ("[T]he fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation");

- Mr. Daza discusses how he was reprimanded for insubordination shortly after complaining to Ms. Cockrum and other employees about Mr. Woodruff using his political offices in family real estate transactions, but this occurred several years before he was terminated. *See Graber*, 763 F.3d at 899;

- Mr. Daza notes that Mr. Fowler called Mr. Daza a "cancer on the department" shortly after he complained about the treatment Mr. Goff received, but the evidence indicates that Ms. Daniel made this reference in an email recapping her discussions with Mr. Schmitt. In any event, Mr. Daza does not tie this incident – which occurred in March 2014 – to Mr. Daza's political affiliation or his termination;

- Mr. Daza argues that Mr. Fowler hired Mr. Brink (a former Knox County Republican Party Chairperson) even though he had no safety director education or experience, but does not explain how this relates to Mr. Daza's termination;

- Mr. Daza contends that shortly after an article on Mr. Woodruff's resignation was published, Mr. Goff complained about political discrimination and Mr. Woodruff emailed the complaint to Mr. Fowler and stated that Mr. Goff may be "one of the guys sending stuff to the media," but does not tie these events to Mr. Daza's own termination;

- Mr. Daza asserts that Mr. Brink began making false accusations against him shortly after Mr. Daza's mother's letter to the editor was published, but does not connect this allegation to Mr. Fowler's decision to terminate him;

- Mr. Daza notes that the trainer complained about Mr. Daza shortly after Mr. Daza's mother's letter to the editor was published, but he does not provide any evidence showing that the two events are linked;

- Mr. Daza argues that Defendants "did not follow progressive discipline for Daza, which they usually did for other employees," but does not provide evidence regarding what that progressive discipline should have been or who those "other employees" are;

- Mr. Daza argues that Defendants did not give Mr. Daza "notice of the allegations and an opportunity to respond, which they give to other employees," but does not provide any details regarding INDOT giving these opportunities to other employees;[8] and

---

[8] To the extent Mr. Daza's complaints regarding the procedure that was followed to discipline and terminate him can be construed as Fourteenth Amendment procedural due process claims, those claims fail because Mr. Daza did not include these allegations in his Amended Complaint and has not developed any argument regarding the process he believes he was entitled to, and how Defendants failed to afford him that process. Further, Mr. Daza would need to show that he had a protected property interest in continued employment, and cannot do so because he is an at-will employee. *Wingo v. City of South Bend*, 444 Fed. App'x 90, 91 (7th Cir. 2011) (affirming grant of summary judgment in favor of employer where employee was an at-will employee and had not established "any protected property interest in continued employment").

- Mr. Daza asserts that Mr. Fowler vacationed with Mr. Woodruff in Cancun, Mexico shortly after Mr. Fowler terminated Mr. Daza, but does not explain the significance of this event nor how it related to his termination.

[Filing No. 73 at 23-26.]

In sum, the Court rejects Mr. Daza's attempt to cobble together unrelated circumstances and events that he believes are indicative of political discrimination, without explaining how those circumstances and events show that, but for his protected affiliation as a Democrat, he would not have been terminated. *Cf. Riley v. City of Kokomo*, 2017 WL 897281, *9 (S.D. Ind. 2017) (granting defendant's summary judgment motion and noting that plaintiff's counsel, who also represents Mr. Daza here, may "believe[ ] that statements scattered throughout his response brief might support [plaintiff's] retaliation claims…, [but] instead presented the Court with a rat's nest," and "the Court refuses to dismantle it…."). The most glaring example of Mr. Daza's kitchen-sink approach is his contention that the fact that Mr. Fowler vacationed with Mr. Woodruff shortly after Mr. Daza's termination somehow indicates that Mr. Daza's termination was politically motivated. Mr. Daza's status as a Democrat, and his citation to unconnected events along with his opinion that he was discriminated against because he is a Democrat, are not enough to survive summary judgment.

### ii.  Mr. Daza's Defense of Mr. Goff

Mr. Daza also bases his political discrimination claims on a 2011 complaint regarding IN-DOT's failure to promote Mr. Goff, a 2011 performance review for Mr. Goff, and the fact that Mr. Daza defended Mr. Goff in connection with a March 2014 incident where INDOT requested that Mr. Goff provide a doctor's note related to missing work due to shingles. As for the 2011 complaint regarding INDOT's failure to promote Mr. Goff and the 2011 performance review for Mr. Goff, not only has Mr. Daza failed to tie those incidents to Mr. Fowler – the decisionmaker here – they are also both too temporally removed from Mr. Daza's termination in 2015. *See Graber*, 763

F.3d at 899 (rejecting political discrimination claim where speech occurred six months before adverse employment action and there was no evidence linking the two events). Mr. Daza's defense of Mr. Goff in connection with INDOT's requirement that Mr. Goff provide a doctor's note relating to missing work does not appear to be political, but rather related to INDOT's policies regarding missing work. And, in any event, Mr. Daza has not presented any evidence that his actions regarding Mr. Goff were a factor in the decision to terminate him.

### iii. The Letter to the Editor

Finally, Mr. Daza argues that he was fired shortly after his mother submitted a letter to the editor that was critical of then-Governor Pence's immigration policy, and that the letter is evidence of political discrimination against him. The undisputed evidence shows that Mr. Fowler, who made the decision to terminate Mr. Daza, did not know about the letter to the editor when he terminated Mr. Daza. [Filing No. 49-21 at 3 (Mr. Fowler stating in his declaration "After I terminated Mr. Daza's employment, I learned that his mother wrote a letter to the editor of [a newspaper] opposing one of former Gov. Pence's policies. No one contacted me about this letter prior to the termination of Mr. Daza's employment, and it did not play any role in my decision to terminate his employment").] The fact that Mr. Daza discussed the letter to the editor with Ms. Cockrum and other INDOT employees before his termination is of no moment. He still must link knowledge of the letter to Mr. Fowler, the decisionmaker, and provide some evidence that the letter factored into the decision to terminate him. This he has not done. Additionally, the close proximity between the publication of the letter (November 2015) and Mr. Daza's termination (December 2015) – without more – is not enough to defeat summary judgment. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 681 (7th Cir. 2015) (suspicious timing alone insufficient to support plaintiff's claim that

complaint regarding discrimination resulted in termination without "corroborating evidence that supports an inference of causation").

Much of Mr. Daza's political discrimination claim is based on speculation, and on his characterization of circumstances and events as politically motivated without any evidence that this was the case. In short, Mr. Daza has not provided admissible evidence showing that but for his political affiliation and protected speech, he would not have been terminated. The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Daza's political discrimination claims.

### b. Race and Color

Defendants argue that Mr. Daza's discrimination claims based on his race and color fail as a matter of law. They assert that Mr. Daza claims that he was subject to race and color discrimination because Ms. Proctor "was motivated by his ethnicity to complain about his misconduct during the December 2015 training session," and because Mr. Daza did not conform to INDOT's "culture." [Filing No. 50 at 18-20.] Defendants argue that there is no evidence other than Mr. Daza's speculation that Ms. Proctor was motivated by racial animus and that, even if she was, she was not involved in the decision to terminate his employment. [Filing No. 50 at 20.] Defendants note that neither Ms. Proctor nor Ms. Saunders made any kind of disparaging statements relating to Mr. Daza's race or ethnicity, and that Mr. Daza's belief that they were motivated by his race or ethnicity is speculation on Mr. Daza's part. [Filing No. 50 at 21.] Defendants assert that Mr. Daza also has not explained how INDOT's Core4 Principles – Respect, Teamwork, Accountability, and Excellence – are racially discriminatory, other than arguing that he "can't comply to that culture" and does not "fit in with what they consider the norm because I don't look like them…." [Filing No. 50 at 23 (discussing Filing No. 49-20 at 17).] Defendants argue further that it is a legitimate

business expectation that INDOT's employees act in accordance with the Core4 Principles and that Mr. Daza was not doing so. [Filing No. 50 at 24.]

In response, Mr. Daza argues that the training conducted by Ms. Proctor did not discuss diversity or different cultures, and instead "promoted a culture of conformity," and that Ms. Proctor "emphasized that he had to have the same culture as the white trainers…." [Filing No. 73 at 30.] He contends that he had been rated well on the Core4 Principles in his reviews. [Filing No. 73 at 30.] Mr. Daza denies saying that the training was "f***ing gay," and maintains that the trainer did not confront him about saying that at the training and admitted that she could not hear how Mr. Daza's training partner responded to the comment. [Filing No. 73 at 31.] Mr. Daza asserts that Ms. Proctor's notes are "false" because they were written later and they noted that the training was on December 3 or December 2, and it was actually on December 1. [Filing No. 73 at 31.] He argues that Ms. Proctor did not request that Mr. Daza be disciplined or terminated, that Mr. Daza did not have an opportunity to respond, and that no one investigated the allegations. [Filing No. 73 at 31.] He also contends that other employees engaged in inappropriate behavior at trainings and were not disciplined or terminated. [Filing No. 73 at 31.] Mr. Daza states that he "could tell [Ms. Proctor] was glaring at him, and so before he was terminated, he alerted the State Personnel Office and stated that he wanted to complain about discrimination based on ethnicity." [Filing No. 73 at 31.] As to INDOT's culture, Mr. Daza argues that "[i]t is racially discriminatory for the Defendants to require [him] to treat whites with Respect, Teamwork, Accountability, and Excellence and then allow the Defendants to not treat [him] with Respect, Teamwork, Accountability, and Excellence." [Filing No. 73 at 32.]

In their reply, Defendants reiterate their arguments and also contend that Mr. Daza's argument that Ms. Proctor stated that he had to have the same culture as the white trainers is a hearsay

statement that Mr. Daza did not disclose during his deposition when he testified that Ms. Proctor never made any disparaging or off-color statements related to his race or ethnicity. [Filing No. 78 at 10.] They also argue again that even if there were evidence that Ms. Proctor acted with racial animus, Mr. Daza has not presented any evidence that Ms. Proctor played any part in the decision to terminate him. [Filing No. 78 at 10.] As to Mr. Daza's argument regarding the culture at INDOT, Defendants argue that Mr. Daza's "abrasive and insubordinate behavior was unacceptable to INDOT, and is readily on display in the evidence." [Filing No. 78 at 11.]

Title VII of the Civil Rights Act of 1964[9] forbids an employer from discriminating against any individual with respect to his "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-2(a)(1)). "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (quotation and citation omitted).

The Court's analysis of Mr. Daza's Title VII claims comes two years after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Since that time, the Court of Appeals has had numerous opportunities to explain and apply *Ortiz* in a variety of employment contexts, and it is to this body of law that the Court now turns. *Ortiz* "discarded the

---

[9] Mr. Daza also alleges a discrimination claim under 42 U.S.C. § 1981. Because the analysis of a Title VII claim and a Section 1981 claim are the same, the Court's discussion of Mr. Daza's Title VII discrimination claim applies with equal force to his Section 1981 discrimination claim. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013).

long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citation omitted). Now, instead of separating evidence under different methods of proof, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cty., Illinois*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). In determining whether the evidence would permit a reasonable factfinder to conclude that Mr. Daza's race or color caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018) (Seventh Circuit in *Ortiz* was "only concerned with the proposition of sorting evidence into 'direct' and 'indirect' piles, and [its holding] did not alter the burden-shifting framework established in *McDonnell Douglas*….").

The Court would generally turn here to a discussion of the methods of proof, aggregating all of the pieces of evidence or working its way through the steps of the *McDonnell-Douglas* framework. However, the Court takes seriously the Seventh Circuit's reminder in *Ortiz* that the applicable legal standard is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or] ethnicity…caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Regardless of the method of proof employed, Mr. Daza must show that his race or color is the but-for cause of his adverse employment action – in this case, termination.

Mr. Daza relies on two incidents in support of his race and color discrimination claims – Ms. Proctor's complaints from the December 1 training session, and INDOT's expectation that he act in accordance with the Core4 Principles. Neither supports claims for race and color discrimination. First, Mr. Daza's argument that Ms. Proctor's complaints about how he acted at the training session show race discrimination is based on pure speculation. The evidence shows that Ms. Proctor perceived Mr. Daza as being uninterested in the training based on Mr. Daza: (1) frequently leaning back in his chair with his arms crossed over his chest; (2) not taking notes or following along very often in the binder of handouts; (3) closing his eyes; (4) telling his training partner "this is f***ing gay"; (5) telling Ms. Proctor he did not have to participate in the training exercise because he tells his employees when they do a good job and it is "all in my head"; and (6) closing his eyes when participants were asked to complete an evaluation form, eventually opening his eyes, but still failing to complete the form. [Filing No. 72-55.] Nothing in these observations points to racial discrimination. Instead, Mr. Daza relies on his own belief that Ms. Proctor glared at him and "stereotyped" him by characterizing him as disengaged because he "was an older, experienced minority employee." [Filing No. 72-3 at 22.] But Mr. Daza has no basis for his claim that Ms. Proctor stereotyped him. Instead, her notes indicate that she found him to be disengaged because he was not participating in the training, his eyes were closed at various points, and she heard him make a disparaging remark regarding the training.

In any event, Ms. Proctor's observations of Mr. Daza and her complaints are a step removed from the analysis the Court must undertake in evaluating Mr. Daza's race and color discrimination claims. Specifically, the Court must consider whether someone involved in the decision to terminate Mr. Daza acted with racial animus. *See Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) ("Derogatory statements made by someone who is not involved in making

the employment decision at issue are not evidence that the decision was discriminatory"); *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[T]here must be a real link between the bigotry and an adverse employment action"). Here, Ms. Proctor passed along her observations to her supervisor, who in turn passed them along to Mr. Fowler and others. Mr. Fowler was the decisionmaker, and Mr. Daza has not presented any evidence that his race or color factored into Mr. Fowler's decision to terminate him. Indeed, it is well-documented in the record that Mr. Fowler and others discussed Mr. Daza's other issues in addition to his behavior at the training session, including being reprimanded in connection with objecting to the INDOT cell phone policy, his general failure to follow the Core4 Principles, his abrasive interactions with another employee related to the respirator incident, and telling employees he had nominated them for bonuses before decisions had been made and not copying Ms. Cockrum on the emails. While Mr. Fowler relied on Ms. Proctor's observations during the training session in deciding to terminate Mr. Daza, he also relied on Mr. Daza's behavior in other situations. And Mr. Daza has not presented any evidence that his race or color played any role whatsoever in Mr. Fowler's decision.

Mr. Daza's second theory is that Defendants acted with racial animus by requiring him to conform to the Core4 Principles. He essentially argues that he was not treated according to the Core4 Principles, so it was racially discriminatory for INDOT to expect him to act according to the Core4 Principles in his interactions with white employees. [Filing No. 73 at 32.] This argument is a non-starter. Mr. Daza has not pointed to any evidence that the Core4 Principles were racially discriminatory in any way, nor that requiring him to comply – along with his fellow INDOT colleagues – with the Core4 Principles was motivated by racial animus. While Mr. Daza may have disagreed with the Core4 Principles, this disagreement is not evidence that he faced racial discrimination by being required to abide by those principles.

Mr. Daza's race and color discrimination claims fail as a matter of law, and the Court **GRANTS** Defendants' Motion for Summary Judgment on those claims.

        c.  <u>Age</u>

In their Motion for Summary Judgment, Defendants argue that Mr. Daza has not presented any evidence that age played a role in the decision to terminate him. [Filing No. 50 at 25-28.] Defendants focus on Mr. Daza's two theories related to his age discrimination claim – that an email Ms. Saunders' sent to Ms. Devocelle regarding Ms. Saunders' conversation with Mr. Tompkins about Mr. Daza's behavior in training exhibits animus due to age, and that INDOT's hiring of Logan Mort-Jones, a younger individual, after Mr. Daza was terminated is also evidence of age discrimination. [Filing No. 50 at 25-28.] Defendants argue that Ms. Saunders never contacted anyone about Mr. Daza, and instead only notified Ms. Devocelle about the conversation she had with Ms. Proctor and Mr. Tompkins regarding why Mr. Daza was not at the second day of training. [Filing No. 50 at 25.] They assert that Mr. Daza admits that Ms. Saunders did not say anything indicating she disliked him because of his age, and admits that he has no reason to believe that she was motivated by age rather than by his behavior. [Filing No. 50 at 25-26.] Defendants also argue that Ms. Saunders was not involved in the decision to terminate Mr. Daza, and that Mr. Daza has not put forth any evidence that Mr. Fowler considered Mr. Daza's age in deciding to terminate him. [Filing No. 50 at 26-27.] Further, Defendants contend that hiring Mr. Mort-Jones, who was younger than Mr. Daza, is not enough to survive summary judgment because INDOT first attempted to hire an individual who was ten years older than Mr. Daza, and eventually hired Mr. Mort-Jones two years after Mr. Daza's termination. [Filing No. 50 at 27.]

Mr. Daza responds that although INDOT attempted to hire an older individual for Mr. Daza's position, "he could not do Daza's job or do the engineer's job." [Filing No. 73 at 33.] Mr.

Daza argues that Mr. Bell performed Mr. Daza's job after he left, and that Mr. Bell "is more than ten years younger than Daza and has much worse performance." [Filing No. 73 at 33.]

In their reply, Defendants argue that Mr. Daza did not address their arguments regarding Ms. Saunders. [Filing No. 78 at 12.] They assert that Mr. Daza's assessment of the qualifications of the older individual that INDOT attempted to hire is irrelevant, and that Mr. Daza cannot rely on Mr. Bell temporarily filling in to support his age discrimination claim. [Filing No. 78 at 12-13.] Defendants argue that Mr. Bell was not a replacement for Mr. Daza, and that INDOT "merely relied on him to carry out the necessary geologist duties while they worked to fill the role on a permanent basis." [Filing No. 78 at 13.] Defendants also note that the hiring of Mr. Mort-Jones occurred nearly a year after Mr. Daza filed this lawsuit, so could not form the basis for his age discrimination claim. [Filing No. 78 at 13.]

The ADEA makes it unlawful for an employer to take an adverse employment action against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1); *see also Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014). The ADEA's protections extend to individuals who are 40 years of age and older. 29 U.S.C. § 631(a). A plaintiff can prove ADEA claims under either the direct or indirect method of proof, *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014), however the Court heeds the Seventh Circuit's instruction in *Ortiz* that "[r]elevant evidence must be considered and irrelevant evidence disregarded but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect,'" *Ortiz*, 834 F.3d at 765. Under the indirect method, a plaintiff must establish a prima facie case of age discrimination by showing that: "(1) he was over forty years of age; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) simi-

larly situated, substantially younger employees were treated more favorably." *Franzoni v. Hart-marx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002). If the plaintiff meets that burden, then the employer must "set forth a legitimate nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. Southern Illinois University – Edwards-ville*, 510 F.3d 772, 783 (7th Cir. 2007) (citation and quotation omitted). If the employer satisfies its burden, the burden shifts back to the plaintiff who must then prove that the proffered reason was pretextual. *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001) (citation omitted).

"[A]ll discrimination claims present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable fact-finder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint School District*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765-66). In this case, the answer to that question as it relates to Mr. Daza's age discrimination claims is "no."

Mr. Daza has not established a prima facie case of age discrimination. First, Mr. Daza has not established that similarly situated, substantially younger employees were treated more favorably. Mr. Daza relies on the fact that Mr. Bell filled in for him after he was terminated, but Mr. Daza's own recitation of the facts states that "Testing Engineer Tompkins, Vincennes Testing Assistant Supervisor Kevin Day, Seymour Geologist Bell, and others had to handle the geologist duties since Daza's position was not filled." [Filing No. 73 at 12.] Mr. Daza has not presented any evidence that Mr. Bell took Mr. Daza's spot, and Mr. Bell pitching in to cover the geologist duties – along with several others – while INDOT searched for a replacement is not evidence that

Defendants treated Mr. Bell more favorably than Mr. Daza.[10] Mr. Daza also has not presented evidence regarding Mr. Bell's duties, whether they were the same as Mr. Daza's, and whether Mr. Bell had exhibited similar behavior to Mr. Daza but was not terminated.

As for INDOT's hiring of Mr. Mort-Jones, who is younger than Mr. Daza, this is insufficient to establish a prima facie case of age discrimination. It is undisputed that INDOT attempted to hire an individual that was older than Mr. Daza to replace him after his termination. Mr. Daza's only response to this is that the older individual was not qualified to do the job, but his opinion that the older individual was not qualified is not evidence of discrimination, *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) ("[Plaintiff's] subjective belief that she was better qualified than [the candidate defendant selected] does not, without more, demonstrate pretext"), and he has not provided any evidence that INDOT's attempt to hire that individual was somehow an attempt to "cover up…age discrimination," [Filing No. 73 at 34]. Additionally, INDOT's hiring of Mr. Mort-Jones nearly two years after Mr. Daza's termination does not save Mr. Daza's age discrimination claims. *See K.H. v. Secretary of the Department of Homeland Security*, 263 F.Supp.3d 788, 802 (N.D. Cal. 2017) (hiring of younger employees two years after plaintiff's termination entitled to little weight); *Foley-Eckhart v. Richard-Allan Medical Industries Inc.*, 1995 WL 861589, *7 (C.D. Cal. 1995) (where younger employee was hired eight months after plaintiff's termination, the passage of time weakened plaintiff's claim and required that he "come forward with additional,

---

[10] The Court acknowledges that the Seventh Circuit Court of Appeals has recognized that evidence that younger employees absorbed the duties of an older, terminated employee can satisfy the similarly-situated requirement of a prima facie case. *See Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1060 (7th Cir. 2008). The situation presented here is significantly different. Mr. Daza has not presented evidence that Mr. Bell and others absorbed his job duties due to a reduction in force at INDOT. Rather, the evidence shows that INDOT unsuccessfully attempted to hire an individual older than Mr. Daza, and that Mr. Bell and others temporarily covered the geologist duties until Mr. Mort-Jones was hired. [*See* Filing No. 49-20 at 19-20.]

direct, circumstantial, or statistical evidence that age was a factor in his termination") (citation and quotation omitted); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1422 (9th Cir. 1990) (employer's hiring of younger employee six or seven months after plaintiff's discharge "substantially weaken[ed]" his claim).

Additionally, Mr. Daza's allegations regarding Ms. Saunders do not save his age discrimination claim. Mr. Daza does not address Defendants' arguments regarding Ms. Saunders in his response brief, but in his surreply argues that he "personally observed Britni Saunders' expressions and actions against [him] and the statements that he was 'disengaged' when in fact, he was one of the most experienced and engaged employees in employee feedback and recognition and all other areas." [Filing No. 81 at 17-18.] Mr. Daza's argument is essentially that he could tell by the look on Ms. Saunders' face that she was discriminating against him based on his age. He testified in his deposition that he thought she was "motivated by age," stating "Well, look at what she did. Look at that guy over there. Closing his eyes. Well, you know, an older gentleman that the eyes don't work so well and sometimes do close them, and she objected to that. So, I mean, she obviously was objecting to an old guy that has tired eyes." [Filing No. 49-20 at 20.] Mr. Daza went on to acknowledge that Ms. Saunders does not know how old he is, that she did not say anything that would indicate that she disliked him because of his age, and that his belief that she was motivated by his age came from the fact that she "piled on" to others' complaints in her email. [Filing No. 49-20 at 20.] Relying on his own assessment of Ms. Saunders' facial expressions and tone in emails to support his age discrimination claim does not save that claim from summary judgment.

Finally, even if Mr. Daza could establish a prima facie case of age discrimination, he has not put forth any evidence showing that Defendants' proffered reasons for terminating Mr. Daza were pretextual. The Court will not second-guess Mr. Fowler's decision to terminate Mr. Daza

based on behavior he found unacceptable, absent any evidence whatsoever that Defendants did not believe those reasons were legitimate. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) ("[W]e 'do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination.'… 'On the issue of pretext, our only concern is the honesty of the employer's explanation.'…And there is no indication in the record that [the employer] did not honestly believe [its actions were correct]") (citation omitted); *see also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (finding insufficient evidence of pretext and stating "it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"); *Pitasi v. Garnter Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) (in order to show pretext, it is insufficient for employee "to show that his employer [acted] for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for [its actions]").

Because Mr. Daza has not established a prima facie case of age discrimination, nor has he presented evidence that Defendants' reasons for terminating Mr. Daza were pretextual, Defendants' Motion for Summary Judgment on Mr. Daza's age discrimination claim is **GRANTED**.

### 2. *Retaliation Claims*

In support of their Motion for Summary Judgment, Defendants argue that Mr. Daza's retaliation claims under Title VII and the ADEA fail as a matter of law because Mr. Daza did not include them in his EEOC Charge. [Filing No. 50 at 28-29.] Defendants also contend that they are entitled to summary judgment on Mr. Daza's retaliation claims related to his political speech

or affiliation under Title VII, the ADEA, and Section 1981 because those provisions do not protect the activity for which Mr. Daza claims he faced retaliation – his mother's letter to the editor, "the constant annoyance that they had because I'm a Democrat," and his defense of Mr. Goff.  [Filing No. 50 at 29.]

In response, Mr. Daza agrees that his claims of political retaliation are not protected by Title VII, the ADEA, or Section 1981.  [Filing No. 73 at 35.]  He argues, however, that his retaliation claims under Title VII and the ADEA  are "related to the original EEOC charge," and are for "Defendants' refusal to rehire Daza after his EEOC charge, and, instead, hire [ ]  other persons who had not complained about discrimination…." [Filing No. 73 at 34.]  In other words, Mr. Daza clarifies that his retaliation claims under those provisions relate to Defendants' post-termination action of hiring his replacement rather than re-hiring him.  [Filing No. 78 at 14.]

Defendants argue in their reply that post-charge retaliation claims may be viable when the employer's actions affect the former employee's ability to find another job, but that "Mr. Daza has not identified any authority (nor have Defendants located any)…, to support the proposition that simply refusing to rehire a terminated employee and filing his position with another employee can be sufficient to establish post-termination retaliation liability."  [Filing No. 78 at 15.]  Defendants argue that "[t]his theory is untenable because it would erase the distinction between discrimination and retaliation claims by allowing terminated employees to claim that the regular business act that typically follows termination – hiring a replacement – is inherently retaliatory."  [Filing No. 78 at 15.]

To succeed on a claim of retaliation, a party must "produce enough evidence for a reasonable jury to infer that [he] engaged in statutorily protected activity, that [defendants] took materi-

ally adverse action against [him], and that [his] protected activity caused the adverse action." *Reliford v. Advance/Newhouse Partnership*, 716 Fed. App'x 551, 554 (7th Cir. 2018). "An employee's complaints about workplace treatment are statutorily protected when they assert that the employer has committed prohibited discrimination." *Id.* To establish the required causal connection, a plaintiff must show that the defendant "would not have taken the adverse…action but for the employee's protected activity." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (alterations in original) (quoting *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999)).

Mr. Daza concedes that Title VII, the ADEA, and Section 1981 do not protect political speech or association, so the Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Daza's retaliation claims brought under those provisions to the extent they are based on Mr. Daza's political speech or association.

a. Statutory Retaliation Claims

**i. Pre-EEOC Charge Conduct**

As for any retaliation claims under Title VII and the ADEA and based on conduct that occurred before Mr. Daza filed his EEOC Charge, the Court finds that those claims fail as a matter of law because Mr. Daza did not exhaust his administrative remedies. Specifically, he did not include those claims in his EEOC Charge. [Filing No. 48-5 at 1 (Mr. Daza stating "I believe that I am being discriminated against due to my race, Hispanic and Native American, color, darker skin, age, over 40, and disability…" and not mentioning retaliation).] The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Daza's retaliation claims brought under Title VII and the ADEA and based on conduct that occurred before Mr. Daza filed his EEOC Charge.

Defendants have not moved for summary judgment on Mr. Daza's Section 1981 retaliation claims (other than to argue that Section 1981 does not protect Mr. Daza's political association).

However, the Court finds it appropriate to consider whether summary judgment is warranted on this claim as well. *See Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 807-08 (7th Cir. 2000) (grant of summary judgment on claims which movant did not explicitly address in motion was not *sua sponte* where parties had addressed issues that were central to those claims and plaintiff "should have known…that a ruling favorable to [defendant on other claims] would spell doom for [those claims]"); *Fox v. Admiral Insurance Co.*, 2016 WL 3520145, *2 (N.D. Ill. 2016) (grant of summary judgment is not *sua sponte* where it is based on "the adversarial issues presented to the Court by the parties") (citation and quotation omitted).

"[A] plaintiff may pursue a retaliation claim regardless of whether the initial claims of discrimination are meritless." *Rowlands v. United Parcel Service – Fort Wayne*, --- F.3d ----, 2018 WL 4041258, *6 (7th Cir. 2018) (citation and quotation omitted). However, the conduct which led to the alleged discrimination and retaliation here is one in the same – Mr. Daza's termination – and the parties have discussed this conduct at length in their briefs. To the extent that Mr. Daza's Section 1981 retaliation claim is based on pre-EEOC Charge or pre-termination conduct, the Court has already found that Mr. Daza has not presented any evidence that his race or color played any part in Mr. Fowler's decision to terminate him, nor any evidence that Defendants' stated reasons for terminating him were pretextual. Additionally, the Court notes that the evidence Mr. Daza has presented indicates that the first time he complained regarding race or color discrimination was on the morning of December 10, 2015 – the day that he was terminated. [Filing No. 72-3 at 23.] The evidence further indicates that Mr. Fowler had decided that termination was appropriate several days before Mr. Daza's complaints, on December 5, 2015. [*See* Filing No. 49-10 at 1 (Mr. Fowler stating in an email to Ms. Daniel and Ms. Cockrum that "I still feel termination is the right action").] Mr. Daza's Section 1981 retaliation claim based on pre-EEOC Charge, or pre-termination,

conduct fails as a matter of law because Mr. Daza has not presented any evidence that his complaints regarding discrimination based on his race or color caused his termination.

### ii.      Post-EEOC Charge Conduct

As for Mr. Daza's Title VII, ADEA, and Section 1981 retaliation claims based on post-EEOC Charge conduct, Mr. Daza argues that Defendants retaliated against him for filing the EEOC Charge by failing to re-hire him and instead trying to hire another individual and having Mr. Bell fill in for him, and also retaliated against him for naming the individual Defendants in his Amended Complaint by refusing his requests for reinstatement and eventually hiring Mr. Mort-Jones. Mr. Daza has not provided any authority to support his contention that the post-EEOC Charge conduct here – Defendants sticking to the decision to terminate Mr. Daza by having other employees cover his position and eventually hiring a replacement – can constitute retaliation. The Court recognizes that there may be instances where the failure to re-hire a previously-terminated employee after that employee has filed an EEOC Charge could constitute evidence of retaliation. *See, e.g.*, *Baines*, 863 F.3d at 663-64 (plaintiff presented sufficient evidence of causal link between filing of EEOC Charge and employer's subsequent failure to rehire him, including the fact that plaintiff's application and interview scores were "mysteriously missing," evidence that decisionmaker was dishonest regarding the timing of filling the position, and evidence that individual who had handled earlier EEOC Charge personally intervened to stop plaintiff from being re-hired). Here, however, Mr. Daza has not presented any evidence that he even re-applied for his position and was rejected and, even if he had, any evidence that his EEOC Charge factored into a decision not to re-hire him. Defendants simply stayed the course, had employees cover Mr. Daza's duties, and eventually hired a replacement – nothing more. No relevant precedent condemns this behavior, or supports Mr. Daza's retaliation claims under Title VII, the ADEA, and Section 1981 based

on post-EEOC Charge conduct, and the Court **GRANTS** Defendants' Motion for Summary Judgment as to those claims.[11]

### b. Constitutional Retaliation Claims

Mr. Daza also sets forth retaliation claims under the First and Fourteenth Amendments.[12] [Filing No. 20 at 5 (alleging in "Count 2 – Retaliation" that "[t]he Defendants knowingly and intentionally discriminated against Plaintiff because he…exercised his rights to free speech and political association, which are violations of…the First and Fourteenth Amendments to the Constitution of the United States of America"); Filing No. 39 at 1 (Mr. Daza stating that his "claims are for discrimination and retaliation based on political association and speech…pursuant to the First and Fourteenth Amendments to the Constitution of the United States of America…").] While Defendants do not address these claims in their motion, the Court considers whether summary judgment is appropriate, *Acequia, Inc.*, 226 F.3d at 807-08, and ultimately finds that they suffer from the same deficiencies as Mr. Daza's discrimination claim based on his political association.

---

[11] Mr. Daza has submitted a hodge-podge of evidence in support of his claims. The Court does not address each piece of evidence Mr. Daza has submitted because, upon review, it has determined that the evidence is irrelevant to his claims. For example, Mr. Daza submits several emails and screenshots of text messages in which his co-workers express dismay over Mr. Daza's termination and pledge their support. [Filing No. 72-5 through Filing No. 72-10.] These messages are not relevant to the key issues in this case – whether Mr. Daza's political affiliation, race, color, or age caused his termination, and whether Defendants retaliated again him. Mr. Daza also submits several newspaper articles, a report from the Inspector General, and purported screenshots of Mr. Brink's twitter feed to support his allegations of corruption and disrepute at INDOT. [Filing No. 72-16; Filing No. 72-25; Filing No. 72-34; Filing No. 72-35; Filing No. 72-36; Filing No. 72-73.] The Court has cited to some of these documents for basic facts (*e.g.*, Mr. Woodruff's resignation from INDOT), but finds the issues which these documents discuss to be irrelevant to Mr. Daza's claims and also note that they relate to a time period long before Mr. Daza's termination.

[12] As noted, the Court assumes that Mr. Daza's mention of the Fourteenth Amendment in connection with his retaliation claims is a reference to the application of the First Amendment to the states through the Fourteenth Amendment. The Court also again notes that Mr. Daza – an at-will employee – would not be able to show that he had a protected property interest in continued employment. *Wingo*, 444 Fed. App'x at 91.

Mr. Daza was not required to include his constitutional retaliation claims in his EEOC Charge but, in order to succeed on those claims, Mr. Daza will still need to show that his protected activity – his political affiliation – caused the adverse action. *Reliford*, 716 Fed. App'x at 554.

The Court again notes that the same conduct which Mr. Daza claims was discriminatory – his termination – is also the conduct which he claims was retaliatory. The Court's finding that the evidence is insufficient to support his political affiliation discrimination claims equally dooms his political affiliation retaliation claim. Specifically, Mr. Daza's defense of Mr. Goff took place long before his termination, and there is no evidence that Mr. Fowler – the individual who decided to terminate Mr. Daza – knew about Mr. Daza's mother's letter to the editor. Further, while it is not clear from the Amended Complaint whether Mr. Daza's constitutional retaliation claims relate to both the pre- and post-EEOC Charge timeframes, to the extent they relate to the post-EEOC Charge (or post-termination) timeframe, they would suffer from the same problem as his statutory post-EEOC Charge retaliation claims.

In sum, the Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Daza's statutory and constitutional retaliation claims, because those that were required to be included in his EEOC Charge were not, and the remaining claims suffer from the same lack of evidence as Mr. Daza's discrimination claims.

### III.
#### CONCLUSION

Mr. Daza's discrimination and retaliation claims are based largely on his perception of the environment at INDOT while he was an employee. But his own interpretations of other people's actions – such as a "look" he received or a feeling that Defendants must have discriminated against him because his is a Democrat or obviously Hispanic, Native American, or older – are not sufficient to withstand summary judgment. The undisputed evidence establishes that Mr. Daza was

terminated for exhibiting insubordinate behavior on repeated occasions. Like the exasperated parents of a petulant teenager, Defendants had had enough of his attitude. Defendants have established this legitimate reason for Mr. Daza's termination, and Mr. Daza has not shown that this reason was pretextual.

For the foregoing reasons, the Court:

- **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Strike Surreply Arguments, [82], as set forth above; and

- **GRANTS** Defendants' Motion for Summary Judgment, [46].

The Court also **DENIES AS MOOT** Mr. Daza's Motion to Compel, [68]. Final judgment shall enter accordingly.

Date: 8/31/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**